Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jorge Alfredo Vivoni Farage<br><br>    Peticionario<br><br>              v.<br><br>María de Lourdes Ortiz Carro<br><br>    Recurrido | Certiorari<br><br>2010 TSPR 206<br><br>179 DPR ____ |

Número del Caso: AC-2009-14

Fecha: 28 de septiembre de 2010

Tribunal de Apelaciones:

        Región Judicial de San Juan Panel III

Jueza Ponente:        Hon. Nestor S. Aponte Hernández

Abogados de la Parte Peticionaria:

                Lcda. Lizabel M. Negrón Vargas
                Lcdo. Víctor Maldonado Gómez

Abogada de la Parte Recurrida:

                Lcda. Magda C. Morales Torres

Materia: Impugnación de Laudo

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jorge Alfredo Vivoni Farage

       Peticionario

                                        Apelación

        v.

María de Lourdes Ortiz Carro      AC-2009-0014

       Recurrido

Opinión del Tribunal emitida por la Jueza Asociada señora Pabón Charneco

En San Juan, Puerto Rico, a 28 de septiembre de 2010.

En el día de hoy atendemos una controversia relacionada con una de las partes más cruciales del proceso arbitral: la ejecución del Laudo y su relación con la gestión judicial. Nos corresponde resolver si luego de un proceso de impugnación de un Laudo que culminó en su confirmación, procede concluir que la obligación contenida en cierta disposición debió ser cumplida al vencer el término de treinta (30) días contado desde la *emisión* del Laudo como éste expresara, o, *a contrario sensu*, desde finalizado el trámite judicial.

Concluimos que los derechos y obligaciones contenidos en un Laudo que ha sido confirmado por los tribunales son válidos y efectivos desde la fecha de su emisión. Esto es de conformidad con el propósito del proceso de arbitraje y la finalidad del Laudo. No obstante, ante los hechos particulares de este caso, en que por los propios actos de la parte a quien beneficiaba la disposición hubo imposibilidad de cumplir con dicho plazo, no podemos permitir que el incumplimiento del referido término le aproveche.

## I

Mediante Sentencia de 3 de junio de 1999 se disolvió el matrimonio del Señor Jorge Alfredo Vivoni Farage, en adelante, el peticionario, y la Señora María de Lourdes Ortiz Carro, en adelante, la recurrida. En ésta se incorporaron una serie de estipulaciones, entre las cuales figuraba: someter a arbitraje los asuntos relacionados a la partición y liquidación de la comunidad de bienes gananciales habida entre ellos una vez decretado el Divorcio por consentimiento mutuo.[1]

La controversia que llega ante nuestra consideración es respecto a una de las propiedades a liquidar, el hogar conyugal ubicado en la Urbanización La Península en Cidra,

---

[1] Las partes estipularon que el Laudo sería final, firme e inapelable y no convinieron que fuera conforme a derecho. Posteriormente, modificaron el acuerdo inicial en varias ocasiones, para prorrogar la fecha de emisión del Laudo; para excluir ciertos bienes de la adjudicación, y para pactar que en caso de cualquier inconveniente o *impasse* en la implantación y/o ejecución de los acuerdos referentes al manejo, administración de bienes o impugnación del Laudo arbitral se pudiera recurrir al procedimiento ordinario dispuesto en la reglamentación pertinente.

en adelante, *La Península*.  Esta propiedad inmueble estaba inscrita a nombre de Steri-Tech, Inc., una corporación autorizada y organizada para hacer negocios bajo las leyes de Puerto Rico y cuyos únicos accionistas eran ambos ex cónyuges.

Tras numerosos incidentes procesales, incluyendo la denegación de la impugnación del *Laudo Parcial*[2] y el *Laudo Final*[3] instada por la recurrida, el árbitro emitió el *Laudo Final Actualizado* el 13 de marzo de 2001. Éste distribuyó de forma definitiva los bienes muebles e inmuebles del caudal comunal, incluyendo la corporación Steri-Tech, Inc. y *La Península*. Con relación a la corporación, el Laudo determinó que:

> Las acciones corporativas de Steri-Tech, Inc. se le adjudican a VIVONI[…] Se le concede a VIVONI un plazo de treinta (30) días a partir del recibo de este laudo para pagarle a ORTÍZ la cantidad de $1,716,752 en pago del balance de su participación en la comunidad de bienes, la cual incluye su participación en dichas acciones. Apéndice de la petición de apelación, pág. 867.

Respecto a *La Península*, el Laudo determinó que:

---

[2] Ambas partes solicitaron la emisión de un Laudo Parcial para distribuir los bienes lo antes posible ante la no disponibilidad de cierta información requerida por el Árbitro para emitir un Laudo Final y por la alegada situación económica precaria que atravesaba una de las partes. Éste fue emitido el 15 de mayo de 2000. Apéndice 11 de la petición de apelación, pág. 828. El 30 de mayo de 2000, la recurrida presentó una *Solicitud de Revocación de Laudo Parcial*.

[3] El 31 de mayo de 2000, el Árbitro emitió el *Laudo Final* reservándose el cómputo final de ciertas partidas debido a no haber recibido información actualizada. El 28 de junio de 2000, la recurrida impugnó el *Laudo Final*. El Tribunal de Primera Instancia consideró procedente el que el árbitro completara su gestión en el término de cuarenta y cinco (45) días.

Debido a que uno de los bienes inmuebles adjudicados a ORTIZ (residencia en la Urb. La Península, Cidra, Puerto Rico) así como los bienes muebles que se encuentran en dicha propiedad pertenecen a la corporación Steri-Tech, Inc., VIVONI viene obligado a hacer las gestiones pertinentes, cumpliendo con todos los requisitos legales, para que dichas propiedades sean transferidas a ORTIZ libres de gravamen. Si por alguna razón, la que sea, el título de dichas propiedades no puede ser transferido a ORTIZ, dentro de los treinta (30) días siguientes a la fecha de este laudo, VIVONI vendrá obligado a pagar a ORTIZ en efectivo la cantidad correspondiente al valor asignado a dicha propiedad en esta partición, incluyendo el valor asignado a los bienes muebles que se encuentran en la propiedad.[4]

Debido a que el titular de dichas propiedades es la corporación Steri-Tech, Inc., la transferencia de dichas propiedades a ORTIZ podría tener un impacto contributivo. VIVONI asumirá cualquier responsabilidad o deuda contributiva que surja como consecuencia de la transferencia de la corporación a ORTIZ de las propiedades correspondientes ya que ORTIZ debe recibir las propiedades por el valor asignado a éstas en este laudo, libre de cargas ó [sic] gravámenes. Apéndice 11 de la petición de apelación, pág. 870.

Cabe señalar que el 6 de abril de 2001 el peticionario, por conducto de su representante legal, le solicitó a la recurrida que le informara cuándo podían otorgar las escrituras correspondientes para traspasar los bienes inmuebles que le fueron adjudicados.[5]

Por su parte, el 1 de mayo de 2001, la recurrida peticionó al Tribunal de Primera Instancia la revocación del *Laudo Final Actualizado* y que se negara poner en efecto

---

[4] El valor total asignado por el laudo a *La Península* y los bienes muebles que ella contiene fue de $1,100,000.

[5] Apéndice 7 de la petición de apelación, pág. 394.

el mismo. En esencia, arguyó que el Laudo no había resuelto todas las controversias que fueron sometidas ante el Árbitro, que éste faltó a su derecho al debido proceso de ley al celebrar entrevistas *ex parte* con empleados de Steri-Tech, Inc., y que actuó en exceso de la facultad delegada en el pacto de sumisión y resolviendo en manifiesta desatención al derecho. El foro primario declaró no ha lugar dicha petición. Por otra parte, el peticionario solicitó la corrección y modificación del Laudo con respecto a las cantidades y cómputos de ciertas partidas. A esta petición, el tribunal de instancia dictaminó "[n]ada más que disponer".

En desacuerdo con las decisiones del tribunal de instancia, ambas partes acudieron al Tribunal de Apelaciones. El 19 de septiembre de 2002, el foro apelativo intermedio revocó las Resoluciones recurridas y concluyó que procedía la revisión del Laudo. Como consecuencia, devolvió el caso al foro primario para que determinara si debía revocarse el Laudo por desviarse de lo pactado y por violación al debido proceso de ley, así como, si hubo errores de cómputo en las partidas cuestionadas. Además, ordenó la designación de un Comisionado a los efectos de actualizar las partidas que serían adjudicadas a cada parte y que se tomaran las medidas cautelares necesarias para la protección y administración efectiva de los bienes.

Así las cosas, el 6 de diciembre de 2005 el tribunal de instancia emitió una Sentencia mediante la cual desestimó la impugnación del *Laudo Final Actualizado* y confirmó el mismo. No obstante, modificó y actualizó varias partidas.

Según surge del expediente, el peticionario, por conducto de su representante legal, se comunicó nuevamente con la recurrida el 28 de diciembre de 2005. Le solicitó a ésta coordinar el otorgamiento de las Escrituras correspondientes.

Inconforme con la determinación del Tribunal de Primera Instancia, la recurrida acudió nuevamente al Tribunal de Apelaciones planteando la comisión de treinta y dos (32) errores. El 28 de diciembre de 2006, el foro apelativo concluyó que el *Laudo Final Actualizado* era válido y había dispuesto de todas las controversias entre las partes, por lo que el cuestionamiento del mismo no afectaba su finalidad, sino su ejecutabilidad. También modificó algunas partidas.[6] De esta decisión, la recurrida acudió ante nos. Mediante Resolución emitida el 20 de abril de 2007 denegamos el auto de *certiorari*, así como dos (2) reconsideraciones presentadas por ésta. El mandato fue devuelto al Tribunal de Primera Instancia el 17 de julio de 2007.

---

[6] La señora Ortíz Carro presentó una Moción de Reconsideración el 22 de enero de 2007. Esta fue denegada mediante Resolución de 9 de febrero de 2007.

El 28 de julio de 2007, el peticionario le cursó una carta a la recurrida con el fin de hacer las transferencias correspondientes sobre la titularidad de los bienes inmuebles contenidos en el laudo. El 1 de agosto de 2007, el peticionario compareció ante el foro primario y solicitó la ejecución parcial del laudo en cuanto a los bienes inmuebles. Posteriormente, se ordenó al peticionario preparar un proyecto de orden de ejecución parcial.

El 4 de octubre de 2007 la recurrida solicitó ante el tribunal de instancia la suma líquida de un millón cien mil dólares ($1,100,000) correspondiente a la adjudicación de *La Península*. También peticionó los intereses sobre esta suma a razón de diez punto cincuenta por ciento (10.50%) – interés legal prevaleciente a la fecha de haberse emitido el Laudo el 13 de marzo de 2001. Indicó además "que aún bajo el escenario de que el término de 30 días antes aludido se compute desde que la Resolución dictada en este caso por el Tribunal Supremo advino final y firme dicho término transcurrió".[7]

El 5 de octubre de 2007, notificado el 14 de noviembre de 2007, el tribunal de instancia declaró Con Lugar la solicitud del peticionario y emitió una Orden para la

---

[7] Apéndice de la petición de apelación, pág. 718.

Surge del expediente que la recurrida también cursó comunicación vía fax al peticionario el día 10 de septiembre de 2007 expresándole que le correspondía satisfacer la suma de un millón cien mil dólares ($1,100,000) más los interés al interés legal prevaleciente a la fecha de emisión del Laudo en efectivo.

expedición de mandamientos mediante los cuales se efectuarían las correspondientes Escrituras de transferencias de todos los inmuebles entre las partes.

No obstante, el 13 de noviembre de 2007 la recurrida presentó una segunda moción reiterando su solicitud del 4 de octubre de 2007. El foro primario le concedió la oportunidad al peticionario de expresarse sobre las mociones presentadas por ésta. Así las cosas, el 3 de diciembre de 2007, la recurrida instó una tercera solicitud de cumplimiento parcial del Laudo. Éstas fueron denegadas por el tribunal de instancia el 10 de diciembre de 2007.

Finalmente, el 19 de diciembre de 2007 se expidió el mandamiento correspondiente y el 4 febrero de 2008 se otorgaron las Escrituras ordenadas.[8] De esta Orden la señora Ortiz recurrió al Tribunal de Apelaciones el 9 de enero de 2008. Dicho recurso fue expedido el 4 de marzo de 2008, como consecuencia quedaron paralizados todos los trámites ante el Tribunal de Primera Instancia.

El 26 de noviembre de 2008, el foro apelativo intermedio revocó la determinación recurrida y declaró la nulidad de los mandamientos expedidos y las Escrituras otorgadas, por entender que como el término de treinta (30) días dispuesto en el Laudo había vencido sin haberse "iniciado gestión alguna para el traspaso", lo que procedía

---

[8] El 4 de febrero de 2008, mediante Escritura de Cesión, Steri-Tech, Inc., representada por el peticionario, cedió la titularidad de *La Península* a la recurrida, representada por el Alguacil del Tribunal.

era el pago en efectivo de la cantidad correspondiente al valor asignado a la propiedad en controversia más los intereses legales desde el 12 de abril de 2001 hasta que se realizara el pago. Razonó que las mociones presentadas no habían impugnado lo dispuesto en el Laudo con relación a *La Península*. Concluyó que computar el término de treinta (30) días desde el 17 de julio de 2007 equivaldría a enmendar el Laudo, facultad de la que carece el foro de instancia.[9]

Inconforme, el peticionario acude ante este Tribunal mediante recurso de apelación y alega los siguientes señalamientos de error:

> **Erró el Tribunal de Apelaciones al resolver que las disposiciones del laudo de arbitraje eran exigibles desde la fecha de su emisión a pesar de las múltiples impugnaciones que del mismo presentase la apelada, las cuales impidieron su ejecución.**
>
> **El Honorable Tribunal de Apelaciones se encontraba impedido de dilucidar controversias ya resueltas por sentencias del propio foro apelativo intermedio que son finales, firmes e inapelables. Además, erró al anular ciertas ordenes [sic] del TPI de las cuales no se solicitó revisión a tiempo y/o mediante *certiorari*, sino en unas mociones de auxilio de jurisdicción que fueron denegadas de plano por el Tribunal de Apelaciones.[10]**

Mediante Resolución emitida el 17 de julio de 2009 acogimos como *certiorari* la solicitud de apelación

---

[9] El peticionario presentó Moción de Reconsideración el 22 de diciembre de 2008 a la que el Tribunal de Apelaciones denegó.

[10] En vista de la conclusión a la que llegamos, asi como que del expediente surge que la petición de *certiorari* de la recurrida ante el Tribunal de Apelaciones fue hecha a tiempo, resulta innecesario discutir este señalamiento del peticionario.

presentada por el peticionario y concedimos a la recurrida término para mostrar causa por la cual no debíamos expedir el recurso.

En su escrito, el peticionario, por una parte, arguye que el Laudo advino ejecutable al devolverse el mandato el 17 de junio de 2007; momento en que éste pudo acudir al tribunal de instancia a solicitar su ejecución. Señala que esto es consecuencia directa del derecho que les asiste a las partes a impugnar un Laudo de Arbitraje o solicitar su corrección. Previo a esa fecha, la impugnación tenía el efecto de impedir la exigibilidad del cumplimiento específico de las disposiciones del Laudo.

Asimismo, el peticionario plantea que, ante los hechos del caso, es de aplicación la Doctrina de Actos Propios puesto que ahora la recurrida intenta beneficiarse del transcurso del tiempo causado por sus propios actos.

Por su parte, la recurrida aduce que el Laudo debía ser cumplido desde su emisión, particularmente cuando los asuntos de la propiedad nunca fueron cuestionados.[11] Asimismo, indica que las Órdenes del Tribunal de Primera Instancia alteran la norma de abstención judicial en

---

[11] Descartamos realizar mayor análisis sobre el argumento de la recurrida sobre que los asuntos de la propiedad nunca fueron cuestionados. Surge del extenso expediente que en todo momento la recurrida cuestionó la validez del Laudo en su totalidad. Inclusive, en el trámite apelativo con relación a la impugnación del Laudo Final Actualizado argumentó que todavía existía entre las partes una comunidad de bienes que estaba pendiente de liquidación por habérsele despojado al árbitro de la encomienda de efectuar la partición y liquidación de la misma.

asuntos resueltos por un Laudo de Arbitraje. Al respecto señala que "la norma existente es que los tribunales no habrán de intervenir o alterar las decisiones del árbitro para aplicar el derecho aplicable".[12]

Señala, además, que Steri-Tech, Inc., y peticionario han incumplido con el mantenimiento de *La Península*.

Asimismo, indica que estando presentado el recurso de *certiorari* ante el Tribunal de Apelaciones, el peticionario otorgó las Escrituras ante el Alguacil.[13]

Examinados los argumentos de ambas partes, procedemos a resolver.

## II

Desde hace varias décadas muchas jurisdicciones han adoptado métodos alternos de solución de disputas. Puerto Rico se ha unido a esta tendencia y ha promovido el desarrollo de mecanismos alternos informales para la solución de conflictos,[14] primero mediante programas de

---

[12] *Escrito en Oposición a que se Expida el Recurso de Certiorari*, pág. 2.

[13] Habiéndose otorgado las Escrituras el 4 de febrero de 2008 y expedido el recurso de *certiorari* por el Tribunal de Apelaciones el 4 de marzo de 2008, referimos a la Regla 35(A)(1) del Reglamento del Tribunal de Apelaciones que dispone que:

> **La presentación de una solicitud de *certiorari* no suspenderá los procedimientos ante el Tribunal de Primera Instancia,** salvo orden en contrario expedida por iniciativa propia o a solicitud de parte por el Tribunal de Apelaciones. La expedición del auto de *certiorari* suspenderá los procedimientos en el Tribunal de Primera Instancia, salvo que el Tribunal de Apelaciones disponga lo contrario. 4 L.P.R.A. Ap. XXII-B R.35. (Énfasis nuestro)

[14] Exposición de Motivos, Ley Núm. 19 de 22 de septiembre de 1983, 1983 Leyes de Puerto Rico 422.

mediación y, posteriormente, a través del arbitraje y la evaluación neutral.

Así las cosas, este Tribunal ha declarado que:

…es política pública de la Rama Judicial fomentar la utilización de mecanismos complementarios al sistema adjudicativo tradicional con el fin de impartir justicia en una forma más eficiente, rápida y económica. Regla 1.01 del Reglamento de Métodos Alternos para la Solución de Conflictos, 4 L.P.R.A. Ap. XXIX R.1(1.01).

Los métodos alternos mencionados han sido integrados a diversidad de controversias presentadas ante los tribunales, más allá de las tradicionales disputas comerciales y de relaciones laborales. Entre ellos se encuentran: cobro de dinero, pensiones alimentarias, relaciones filiales, agresiones, disputas entre arrendador y arrendatario, conflictos entre parejas, familiares y vecinos, así como con relación a contratos de construcción, de servicios o de ventas.[15]

Ahora bien, nos urge analizar un aspecto sumamente importante que se suscita en el caso de autos y su largo trámite arbitral y judicial: el uso del arbitraje para efectuar la partición y liquidación de los bienes conyugales con posterioridad al decreto de un Divorcio por consentimiento mutuo. A pesar de que ambas partes no han planteado este asunto, no podemos obviar que esta cuestión

---

[15] Véase, Negociado de Métodos Alternos para la Solución de Conflictos, *Datos agregados de los Centros de Mediación de Conflicto para el año fiscal 2005-2006*. Disponible en http://www.ramajudicial.pr/NegMed/Centros_Mediacion/datos/CMC05-06.pdf.

está en extremo relacionada con la controversia que las partes nos presentan. Es necesario que nos expresemos al respecto. De lo contrario, el silencio de este Tribunal podría entenderse como su aprobación tácita y alimentaría tal proceder.

**A**

Nuestro ordenamiento jurídico favorece el uso de métodos alternos de solución de conflictos y con mayor particularidad el arbitraje. La Ley Núm. 376 de 8 de mayo de 1951, conocida como Ley de Arbitraje de Puerto Rico, 32 L.P.R.A. sec. 3201, a través de un lenguaje más amplio y flexible que su contraparte federal,[16] permite el que dos (2) o más partes convengan por escrito en someter a arbitraje cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje. 32 L.P.R.A. sec. 3201. Véase, D.M. Helfeld, *La Jurisprudencia Creadora: Factor Determinante en el Desarrollo de Arbitraje en Puerto Rico*, 70 Rev.Jur. U.P.R. 1, 54-55 (2001).

Así las cosas, hemos examinado el uso de estipulaciones mediante las que se conviene el arbitraje para sacar del cauce judicial las disputas comerciales. *Febus y otros v. MARPE Const. Corp.*, 135 D.P.R. 206 (1994). Al respecto hemos expresado que como norma general, la

---

[16] Ley Púb. Núm. 282, de 30 de julio de 1947, según enmendada (61 Stat. 669), 9 U.S.C. sec. 1 *et seq.*, conocida en inglés como *Federal Arbitration Act*.

jueza o juez aceptará las estipulaciones que las partes le sometan para finalizar un pleito o un incidente dentro del mismo. *Rodríguez Rosado v. Zayas Martínez*, 133 D.P.R. 406, 410 (1993). Esto, pues, las estipulaciones "persigue[n] evitar dilaciones, inconvenientes y gastos y su uso debe alentarse para lograr el propósito de hacer justicia rápida y económica". *Mun. de San Juan v. Prof. Research*, 171 D.P.R. 219, 238 (2007). Ante esto, no podemos ignorar que tales propósitos son afines a los del arbitraje.

Sin embargo, los tribunales no están obligados a aprobar las estipulaciones que se le sometan. *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 72 (1987). Véase además, *Rodríguez Rosado v. Zayas Martínez, supra*. La autonomía de la voluntad de los contratantes no es irrestricta, pues "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372.

Al respecto, hemos sido particularmente cautelosos al examinar las estipulaciones en los casos de familia e insistentes en aquéllos relacionados con alimentos de menores. *Rodríguez Rosado v. Zayas Martínez, supra*; *Negrón Rivera y Bonilla, Ex parte, supra*. Asimismo, hoy enfatizamos nuevamente la prudencia con la que los jueces y juezas deben examinar las estipulaciones en casos de

familia y singularmente las estipulaciones de los cónyuges en un Divorcio por consentimiento mutuo.

**B**

Por otro lado, en *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 277 (1978), reconocimos la causal de divorcio por consentimiento mutuo y destacamos que no se aceptaría petición alguna bajo dicha causal sin que las partes adjuntaran las estipulaciones sobre la división de bienes, el sustento de las partes y otras consecuencias del divorcio. Esto, en reconocimiento de la delicadeza de tales asuntos y, más aún, para asegurarnos de que la petición de divorcio no fuera producto de la irreflexión o de la coacción y hasta tanto la Asamblea Legislativa no prescribiera otras normas. *Íd.* Además, hemos señalado que:

> …la imposición del **requisito de estipular lo relativo a la división de bienes tiene el propósito de que una vez se haya decretado el divorcio las partes no tengan que enfrentarse de nuevo a dilucidar aspectos de la liquidación del régimen económico que puedan traer hostilidades y desavenencias entre ellos.** Todos los componentes del proceso – jueces, abogados y peticionarios – deben cerciorarse de que antes de redactar las estipulaciones, han pasado por un proceso deliberativo que les haya permitido meditar sobre las consecuencias económicas que el divorcio tendrá para cada uno. A veces, la prisa por obtener el divorcio hace que se lleguen a acuerdos que las partes no pueden cumplir, recargando a los tribunales con incidentes relacionados con el incumplimiento de las estipulaciones. *Igaravidez v. Ricci*, 147 D.P.R. 1, 7 esc. 2 (1998)(Énfasis suplido).

En el presente caso hemos visto como se desvirtuó el propósito de una de las normas establecidas en *Figueroa*

*Ferrer v. E.L.A.*, *supra*, utilizando la estipulación para dirigir el pleito a un procedimiento de arbitraje, y las consecuencias que acarreó su mal uso. El tribunal de instancia autorizó la disolución del vínculo matrimonial del peticionario y la recurrida por la causal de consentimiento mutuo.[17] Asimismo, aprobó la estipulación de que se tramitaran todos los asuntos relacionados con la liquidación de la comunidad de bienes resultante mediante un proceso de arbitraje. Once (11) años más tarde, las partes continúan litigando sobre estos bienes. Todo el proceso arbitral y judicial ha estado mediado por la falta de consenso entre ambas partes con relación a la liquidación de sus haberes.

Por todo lo antes expuesto – y ante el hecho de que el uso del arbitraje en estos casos puede exacerbar otros problemas al no existir parámetros claros para su empleo en este tipo de relaciones – este Tribunal rechaza el uso de las estipulaciones para someter a arbitraje la partición y liquidación del caudal de la sociedad de bienes gananciales luego de decretado el **Divorcio por la causal de consentimiento mutuo.** De lo contrario se dejarían inconclusos aspectos tan importantes y de suma delicadeza que deben ser resueltos a la hora de disolver el vínculo conyugal.

---

[17] La acción de divorcio del caso de autos fue originalmente radicada bajo una causal culposa. Posteriormente, las partes convinieron en modificar la causal por la de consentimiento mutuo.

Señalamos que de forma alguna rechazamos los beneficios que el arbitraje, en aspectos esenciales de un divorcio o en otro tipo de disputas familiares, pueda proporcionar.[18] Aunque para algunos cónyuges el proceso adversativo en los tribunales es la mejor opción para llevar todos los asuntos relacionados con el divorcio, éste puede no serlo para otros.[19] No obstante, en Puerto Rico

---

[18] Diversos autores reconocen los beneficios de los distintos métodos de resolución de conflictos en el ámbito familiar, particularmente el divorcio. Esto para atender asuntos tanto previo al divorcio como con posterioridad al mismo. Véanse, J.F. Kessler *et al.*, *Why Arbitrate Family Law Matters?,* 14 J.Am. Acad. Matrimonial Law 333 (1997); T.E. Carbonneau, *A Consideration of Alternatives to Divorce*, 1986 U. Ill. L. Rev. 1119, 1156; R.R. Block, *Divorce Arbitration: An Alternative to Mediation* en *Contemporary Matrimonial Law Issues: A Guide to Divorce Economics and Practice*, Nueva York, Ed. Law and Business, Inc., 1985, págs. 784-794.

Asimismo, algunos autores han argumentado a favor del desarrollo de leyes especiales que regulen el arbitraje para disputas maritales y reconocen la dificultad de este tipo de arbitraje amparado en los estatutos generales de arbitraje. Véase, F.L. McGuane, Jr., *Model Marital Arbitration Act: A Proposal*, 14 J. Am. Acad. Matrimonial Law 393 (1997). Véase además, T.E. Carbonneau, *supra*, pág. 1127. ("[T]raditional techniques of arbitral adjudication would be of only limited utility in the divorce context."). Ya en 1999 el estado de Carolina de Norte adoptó un estatuto de arbitraje diseñado para los casos de derecho de familia. Éste ha sufrido ciertas enmiendas. Otros estados como Colorado, Connecticut, Indiana, Michigan, New Hampshire y Nuevo México han provisto legislación al respecto. Empero, algunas jurisdicciones han permitido por vía jurisprudencial el arbitraje de ciertos asuntos de familia a la luz de sus estatutos generales de arbitraje, mientras otras jurisdicciones han suplementado los estatutos generales con reglas específicas para atender materias familiares. Véase, L.P. Burleson, *Family Law Arbitration: Third Party Alternative Dispute Resolution*, 30 Campbell L. Rev. 297, 297-98 (2008) ("Unfourtunately, due to the unique nature and needs of matrimonial cases, general commercial arbitration statutes are often deficient and provide insufficient authority to address all of the issues that we face in our matrimonial cases.") Véase además, G.K. Walker, *Family Law Arbitration: Legislation and Trends*, 21 J. Am. Acad. Matrimonial law 521 (2008); G.K. Walker, *Arbitrating Family Law Cases by Agreement*, 18 J. Am. Acad. Matrimonial Law 429 (2003).

[19] M.S. Herrman *et al.*, *Mediation and Arbitration Applied to Family Conflict Resolution: The Divorce Settlement,* 34(1) The Arbitration Journal 17, 18, 21 (1979). (Expresa que "[t]he use of an adversarial model to reach a settlement usually increases trauma and escalates conflict." No obstante, "[t]here are extreme cases, both positive and negative, where the techniques are not appropriate. Couples deciding on an equitable settlement prior to seeking legal assistance do not

no existen parámetros para lidiar con los efectos económicos del divorcio mediante el arbitraje. La creación de éstos no nos compete. Situación distinta sería el que la Asamblea Legislativa autorice su uso y establezca parámetros para estos casos.

Contrario a lo que sucede en las relaciones comerciales y laborales, el proceso de divorcio y todo lo que éste conlleva está cargado de las más íntimas emociones, sentimientos y no necesariamente ambos cónyuges están en igual posición económica y emocional, entre otros aspectos.[20] Esto nos dificulta equiparar el trámite arbitral en un divorcio con el arbitraje comercial. [21]

No obstante, debido al largo tiempo que lleva éste caso litigándose sería en extremo perjudicial para las partes involucradas, que descartemos el trámite arbitral y judicial que se ha suscitado por los pasados once (11) años. Después de todo, la sentencia que lo estableció ya es final y firme. Sin embargo, advertimos que no se favorece el uso desvirtuado del arbitraje en los divorcios y mucho menos el que los tribunales autoricen este tipo de

require third-party intervention.  The techniques would also not be appropriate if the level of conflict between the parties is too high to permit communication….")

[20] Sobre la posible desigualdad entre las partes véase, A.R. Imbrogno, *Arbitration as an Alternative to Divorce Litigation: Redefining the Judicial Role*, 31 Cap. U.L. Rev. 413, 427, 437 (2003)("The problem is that to be effective, ADR demands that the participating parties be in a position of relatively equal power.").

[21] Véanse, M. Domke, *Domke on Commercial Arbitration*, 3ra. ed., Minnesota, Ed. West Thomson, 2009, Vol. I, pág. 41-1; T.E. Carbonneau, *supra*, 1154-55.

estipulaciones en casos de divorcio por consentimiento mutuo. En esos casos, la estipulación debe contener lo relativo a la división de bienes. *Figueroa Ferrer v. E.L.A., supra.*

Así las cosas, hoy hacemos eco de nuestra expresión en *Negrón Rivera y Bonilla, Ex parte,* 120 D.P.R. 61 (1987), optimistas de que esta vez nuestras palabras sí sean atendidas:

> Los hechos del caso ante nos son ilustrativos de los problemas que surgen en los casos de divorcio por la causal de consentimiento mutuo. Demuestran una vez más la urgente necesidad que existe de aprobar guías y reglamentación uniforme en esta crucial área del derecho de familia y de que haya una mayor, efectiva y adecuada intervención por parte de los tribunales y de los abogados de las partes en el proceso. Reflejan, además, la falta de asesoramiento responsable a las partes por sus abogados. *Íd.* pág. 66.

Dicho esto, procedemos a analizar la controversia particular traída ante nuestra atención.

### III

Se presentó ante nos una controversia respecto a la ejecución de un Laudo cuya validez ha sido confirmada por los tribunales de conformidad con la Ley Núm. 376, *supra.* Señalamos que nuestro examen se limita a la ejecución del Laudo respecto a la propiedad inmueble *La Península.*

### A

En nuestro ordenamiento jurídico existe una política pública vigorosa que favorece la sumisión de las partes a los procedimientos de arbitraje a tenor con la doctrina de

la autonomía de los contratantes, en tanto y en cuanto haya sido pactado y se limite a lo concertado. 32 L.P.R.A. sec. 3201; 31 L.P.R.A. sec. 3372. Véanse, *Municipio de Mayagüez v. Lebrón*, 167 D.P.R. 713 (2006); *Crufon Const. v. Aut. Edif. Púbs.*, 156 D.P.R. 197 (2002).

Mediante este método alterno de solución de disputas, las partes sustituyen a los tribunales por un árbitro que determine todas las cuestiones de hecho y de derecho habidas entre ellas. *Autoridad sobre Hogares v. Tribl. Superior*, 82 D.P.R. 344 (1961); *Junta Relaciones del Trabajo v. N.Y.&P.R. S/S Co.*, 69 D.P.R. 782 (1949). Finalizado el trámite ante el árbitro, las determinaciones de éste contenidas en el laudo son, como norma general, finales e inapelables, por lo que las cuestiones atendidas en el Laudo no pueden litigarse ante los tribunales. *J.R.T v. Otis Elevator Co.*, 105 D.P.R. 195 (1976). Esta norma se encuentra arraigada en el principio de auto restricción y en la deferencia que los tribunales otorgamos a los árbitros. *Febus y otros v. MARPE Const. Corp.*, *supra*.

No obstante, nuestro ordenamiento reconoce unas instancias en las que se autoriza la intervención judicial. La revisión judicial se permite cuando las partes convienen expresamente que la controversia sometida al árbitro sea resuelta conforme a derecho. *Íd.*, págs.. 216-17; *U.C.P.R. v. Triangle Engineering Corp.*, 136 D.P.R. 133, 142 (1994); *Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 608

(1979).   Asimismo, la Ley Núm. 376, *supra*, otorga un término de un (1) año para la confirmación del Laudo y un periodo de tres (3) meses para solicitar la revocación, modificación o corrección de un Laudo limitada a los motivos expuestos en la ley y que han sido previamente examinadas por este Foro. 32 L.P.R.A. secs. 3221 y 3224. Véase además, *Autoridad sobre Hogares v. Tribl. Superior*, *supra*.

Al concluir el trámite y expedirse una Orden confirmando, modificando, corrigiendo o revocando el Laudo, se dicta una sentencia de conformidad que "tendrá la misma fuerza y vigor en todo respecto y estará sujeta a las mismas disposiciones de ley que se refieran a sentencias en una acción civil" y puede ser recurrida mediante el recurso de *certiorari*. 32 L.P.R.A. secs. 3225, 3227, 3228.

En el caso de autos los tribunales intervinieron al haberse presentado oportunamente peticiones para revocar el Laudo, por una parte, y corregir el mismo, por otra.  No obstante, acude ante nos una de las partes para que examinamos específicamente cuándo un Laudo – que determina la realización de un negocio jurídico dentro de un periodo de tiempo contado desde la emisión del Laudo – adviene ejecutable y exigible.  Por lo tanto, centramos nuestra atención en la ejecución de un Laudo de Arbitraje.

**B**

En gran parte de los casos, los Laudos son ejecutados voluntariamente por las partes. M. Domke, *Domke on Commercial Arbitration*, 3ra. ed., Minnesota, Ed. West Thomson, 2009, Vol. II, pág. 41-1; D.M. Helfeld, *supra*, pág. 100 (2001). En tales circunstancias, aplica nuestra expresión en conformidad con el Artículo 21 de la Ley Núm. 376, *supra*, de que "[n]o se precisa de la confirmación judicial para la validez y efectividad de un laudo de otro modo válido". *Autoridad sobre Hogares v. Tribl. Superior*, *supra*, pág. 361.

No obstante, existen situaciones en que las partes – o alguna de éstas – difieren sobre la validez o corrección del Laudo, se resisten a su cumplimiento o sencillamente prefieren la confirmación de éste por los tribunales. En tales situaciones, a falta de una ejecución voluntaria, la parte que persigue su cumplimiento tiene la opción de solicitar la confirmación del Laudo mediante un procedimiento sumario y su posterior ejecución a través los procedimientos establecidos para la ejecución de sentencias. 32 L.P.R.A. secs. 3202, 3221, 3225, 3227. Véanse además, M. Domke, *supra,* pag. 42-1; S.J. Ware, *Principles of Alternative Dispute Resolution,* 2da. ed., Minnesota, Ed. West Thomson, 2001, págs. 22, 109-10.

Cabe apuntar que la confirmación del Laudo por una sentencia no implica que éste haya carecido de validez y

efectividad hasta finalizado el trámite judicial. Negarlo durante ese periodo derrotaría la finalidad y obligatoriedad que distingue al Laudo Arbitral y protegería el uso de prácticas dilatorias para no cumplir con el Laudo.[22] Por lo tanto, concluimos que los derechos y las obligaciones de las partes fueron determinados en el Laudo y no por la sentencia que lo confirma. Sin embargo, ante la falta de ejecución voluntaria, el Laudo ciertamente no podrá ser puesto en vigor sin otras medidas coercitivas, pero por razones de equidad como discutiremos adelante, esta falta de ejecución no puede beneficiar a quien en principio se negara.

Por otra parte, la Asamblea Legislativa contempló la situación en que una de las partes solicitara la confirmación del Laudo mientras que la otra parte peticionara oportunamente su revocación, modificación o corrección conforme a la citada Ley Núm. 376. 32 L.P.R.A.

---

[22] Previamente hemos adoptado el cumplimiento del Laudo desde su emisión en el arbitraje obrero-patronal. Esto a pesar del subsiguiente proceso judicial. Véase, *Junta de Relaciones del Trabajo v. N.Y.&P.R. S/S. Co.*, 69 D.P.R. 814, 816 (1949) ("El laudo aquí envuelto no es nuestro. Fué [sic] dictado por el Comité, y se emitió el 21 de junio de 1948. Cuando se pone en vigor, se hace por tanto con efecto a la fecha en que se emitió. Resolver lo contrario permitiría a los patronos emplear las dilaciones de pleitos como un medio para posponer durante meses la fecha de efectividad de un laudo que válidamente ordena la reposición".] Véase además, *Marion Mfg. Co. v. Long*, 588 F.2d 538 (6to Cir. 1978).

Aunque no descartamos que un proceso de arbitraje puede conllevar de forma justificada un extenso trámite judicial posterior, no toleraremos el uso de prácticas dilatorias que afecten el propósito del arbitraje y que intenten relitigar las disputas en los tribunales. *J.R.T. v. Otis Elevator Co.*, 105 D.P.R. 195 (1976); *Autoridad sobre Hogares v. Tribl. Superior*, 82 D.P.R. 344 (1961). Advertimos que el abuso de los procedimientos judiciales sin fundamentos para dilatar el proceso arbitral o la ejecución del laudo, podrían conllevar sanciones.

sec. 3224.    Ante esta situación el estatuto claramente expresa que el juez o la jueza podrá suspender los procedimientos iniciados por la parte contraria para poner en vigor el Laudo en lo que se atiende la solicitud de revocación, modificación o corrección. *Íd.*

Indiscutiblemente, en ocasiones el tribunal preferirá no ordenar la ejecución de un Laudo impugnado o del que se solicita algún cambio hasta que emita sentencia respecto a la moción para revocarlo, modificarlo o corregirlo.  En otras circunstancias, como cuando ciertas disposiciones del Laudo no sean cuestionadas y sean separables de aquéllas que sí lo fueran,[23] puede que permita la continuación de los procedimientos para ponerlo en vigor.  Esto queda dentro de la sana discreción del juzgador.

En el caso de autos, ninguna de las partes recurrió a los tribunales buscando la confirmación y ejecución del *Laudo Final Actualizado* tan pronto fue emitido. *A contrario sensu*, la recurrida solicitó oportunamente su revocación mientras que el peticionario argumentó su corrección.  El Laudo fue finalmente confirmado con ciertas correcciones y actualizaciones que en nada afectaron las disposiciones referentes a *La Península*.  Por lo tanto, la disposición que adjudicaba a la recurrida la propiedad – o la cantidad equivalente a su valor – era válida y obligatoria desde la emisión del Laudo.

---

[23] *J.R.T. v. Otis Elavator Co.*, *supra*, pág. 202 (1976).

Empero, los principios que rigen el arbitraje tampoco son absolutos. Tiene mérito el argumento del peticionario respecto a la aplicación de la Doctrina de Actos Propios a la solicitud de la recurrida. Procedemos, entonces, al análisis de la referida doctrina.

**C**

La prohibición de *venire contra factum* o de "ir contra los propios actos" forma parte del Artículo 7 del Código Civil, 32 L.P.R.A. sec. 7, y está cimentado en la necesidad de proceder con buena fe en "el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones". *Int. General Electric v. Concrete Builders.*, 104 D.P.R. 871, 876 esc. 4, 877 (1976). Por ello hemos dispuesto que "[l]a conducta contradictoria no tiene lugar en el campo del Derecho, y debe ser impedida." *Íd,* pág. 877.

Además, hemos adoptado tres (3) elementos constitutivos para la aplicación de la Doctrina de Actos Propios:[24]

> (a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le

---

[24] Véase, J. Puig Brutau, *Estudios de Derecho Comparado: la doctrina de los actos propios*, Barcelona, Ed. Ariel, 1951, pág. 112. Véase además, L. Díez-Picazo, *La doctrina de los Propios Actos: Un Estudio Crítico sobre la Jurisprudencial del Tribunal Supremo*, Barcelona, Ed. Bosch, 1963.

causaría un perjuicio si su confianza quedara defraudada. *Íd.*, pág. 878.

En el caso de autos, la recurrida en todo momento rechazó el traspaso de la propiedad que ahora argumenta nunca estuvo en disputa; le solicitó al tribunal que no pusiera en efecto el Laudo; argumentó que la validez del Laudo quedaba en suspenso y por lo tanto, el peticionario no lo podía poner en ejecución.

Por otro lado, el peticionario le solicitó a la recurrida mediante carta en diversas ocasiones que suscribiera la Escritura de traspaso de *La Península*, incluso previo a que la recurrida impugnara el *Laudo Final Actualizado.* Además, el peticionario consignó algunas de las sumas debidas. En su momento, también peticionó al foro primario la ejecución del Laudo en cuanto a *La Península.*

Ante este cuadro fáctico, nos sorprende que ahora la recurrida exija el cumplimiento del Laudo desde su emisión puesto que el peticionario pudo solicitar previamente su ejecución por medios coercitivos; que se entienda transcurrido el periodo de treinta (30) días, y que se le otorgara el pago de la suma líquida con intereses desde hace más de nueve (9) años. Su pretensión busca claramente el resultado opuesto al de sus declaraciones previas.

Concluimos que se dan a cabalidad los tres (3) elementos de la Doctrina de Actos Propios en este caso: la recurrida incurrió en una conducta previa y durante el

proceso judicial que influyó en los actos del peticionario para transferir la propiedad. Exigirle al peticionario el pago de la suma líquida y los intereses luego de nueve (9) años de emitido el Laudo conllevaría un indudable perjuicio para éste.  Por lo tanto, rechazamos el petitorio de la recurrida.

Por otro lado, la recurrida reclama que la propiedad no recibió el mantenimiento necesario y requerido por la corporación interventora.[25]   En principio, el Laudo le

---

[25] Con relación a La Península, el Laudo especifica que:

> [E]ra responsabilidad de ambos el contribuir los fondos requeridos para cubrir todos los pagos relacionados con los bienes inmuebles.  Esto era así para todas las propiedades inmuebles pertenecientes a la comunidad de bienes, excepto por la residencia localizada en la Urb. La Península en Cidra (la cual pertenecía a la corporación Steri-Tech, Inc. y para la cual se acordó lo siguiente:
>
>> 'Sobre los gastos de mantenimiento del inmueble que comprenden fumigación, sistemas eléctricos, aires acondicionados, cisterna, planta eléctrica, el portón eléctrico; la interventora asumirá los mismos debiendo la peticionaria notificarle de la necesidad de ellos por escrito o por medio electrónico.  Por otro lado, la interventora reparará los daños ocasionados por el Huracán Georges, excepto pintar la estructura'.
>
> ORTIZ se rehusó a hacer aportación alguna por lo cual VIVONI utilizó [préstamos recibidos de Steri-Tech, Inc. y Retenciones a ORTIz del "rédito" a ser pagado a ésta] para efectuar algunos de los pagos.
>
> Por otro lado, Steri-Tech, Inc. también incumplió con su obligación de proveerle el mantenimiento acordado a la propiedad en la Urb. La Península.  De la evidencia desfilada surge que la mayoría de las propiedades por las cuales la comunidad de bienes se hizo responsable de mantener, no se le dio el mantenimiento adecuado. Igual suerte sufrió la propiedad a la cual Steri-Tech, Inc. se supone le diera mantenimiento.
>
> Es la conclusión del Árbitro que todas las partes incumplieron con sus obligaciones al respecto por lo cual se ordena lo siguiente:
>
> […]

exigía a la recurrida que le informara a la compañía interventora la necesidad del mantenimiento, pero en algún momento, la recurrida y los menores cambiaron su residencia y la propiedad quedó en posesión de Steri-Tech, Inc.

Puesto que solamente contamos con las alegaciones de la recurrida al respecto, y muy a pesar de nuestro interés en que esta controversia finalice cuanto antes, nos vemos forzados a devolver los autos al Tribunal de Primera Instancia para que determine si la compañía interventora debe efectuar algún tipo de arreglo a la propiedad por no brindar el mantenimiento requerido o compensar por la falta del mismo hasta el momento del traspaso a la recurrida.

## IV

Por lo antes expuesto, expedimos el auto solicitado, y revocamos la Sentencia recurrida. Devolvemos los autos al Tribunal de Primera Instancia para la continuación de los procedimientos conforme a lo aquí resuelto.

Se dictará Sentencia de conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

---

3- Steri-Tech, Inc., a su propio costo, deberá contratar el personal técnico requerido para efectuar las reparaciones requeridas en la residencia localizada en la Urb. La Península, dentro de los próximos 30 días.

4- Steri-Tech, Inc. deberá proveer el mantenimiento normal requerido en dicha propiedad hasta la ejecución del laudo. *Apéndice de la Petición de certiorari*, pág. 867. (Énfasis nuestro).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jorge Alfredo Vivoni Farage

     Peticionario

                                      Apelación

     v.

María de Lourdes Ortiz Carro          AC-2009-0014

     Recurrido

SENTENCIA

En San Juan, Puerto Rico, a 28 de septiembre de 2010.

Por lo antes expuesto, expedimos el auto solicitado, y revocamos la Sentencia recurrida. Devolvemos los autos al Tribunal de Primera Instancia para la continuación de los procedimientos conforme a lo aquí resuelto.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton concurre y hace constar la siguiente expresión:

> El Juez Presidente señor Hernández Denton concurre con la Opinión del Tribunal. Aunque coincide con el resultado al que llega la mayoría, entiende que en estricta juridicidad, era innecesario pautar en este caso una norma relativa a la procedencia del arbitraje en los casos de divorcio por consentimiento mutuo. Dicha controversia no fue suscitada por las partes ni por los foros recurridos, por lo que ésta no fue discutida ni argumentada en ninguna etapa del procedimiento judicial. Por ende, lo expresado por el Tribunal sobre la

validez del mecanismo de arbitraje acordado por las partes para liquidar la sociedad legal de gananciales no pasa de ser **un dictum**.

La Juez Asociada señora Rodríguez Rodríguez disiente y concurre con Opinión escrita a la que se le une la Jueza Asociada señora Fiol Matta.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Jorge Alfredo Vivoni Farage

    Peticionario

      v.

                              AC-2009-14

María de Lourdes Ortiz Carro

    Recurrida


Opinión disidente y concurrente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se le une la Jueza Asociada señora Fiol Matta


San Juan, Puerto Rico, a 28 de septiembre 2010

Discrepo del curso de acción que hoy anuncia la mayoría de este Tribunal. La opinión ante nuestra consideración presenta una controversia planteada por las partes y otra creada por el Tribunal. La primera, requiere resolver a partir de qué momento un laudo de arbitraje es ejecutable. La otra, la controversia de génesis judicial, atiende el asunto de si está disponible para el divorcio por consentimiento mutuo el mecanismo de arbitraje para liquidar y adjudicar los haberes de la sociedad legal de gananciales. Respecto esta última, el Tribunal resuelve en un *dictum,* que ese mecanismo no está disponible aunque, paradójicamente, lo valida

en este caso. Estoy en desacuerdo con la postura adoptada por la mayoría por considerar que nada en nuestro ordenamiento manda tal resultado, y que se basa, entre otras cosas, en una desafortunada lectura del alcance de nuestro dictamen normativo en *Figueroa Ferrer v. E.L.A.,* 107 DPR 250 (1978). Pero, sobre todo, porque no sólo se atiende una controversia ajena a lo planteado por las partes sino que, al resolverla, se expone una visión limitada del alcance de nuestra función judicial para resolver controversias noveles de derecho.

Por otro lado, me preocupa la reticencia de una mayoría de los miembros de este Tribunal a utilizar los mecanismos alternativos de resolución de disputas en áreas no tradicionales. *V. gr., Pueblo en el interés del menor A.V. L.,* res. 17 de febrero de 2010, 178 DPR ___, 2010 TSPR 20. Considero que esta actitud supone descartar lo que ha sido un adelanto cualitativo en la forma y manera de atender y resolver conflictos interpersonales. La postura del Tribunal es contraria a las más modernas corrientes que promulgan la búsqueda de soluciones consensuadas a los conflictos como mecanismo para la buena y pacífica convivencia de los ciudadanos.

Igualmente de preocupante es la tendencia mayoritaria de "proteger" a los ciudadanos que tratan de buscar soluciones a sus problemas vinculados a su intimidad personal y familiar, imponiéndoles controles sobre dichas manifestaciones de voluntad. Es decir, protegiendo al ciudadano de sí mismo. Recordemos que en nuestro

ordenamiento las relaciones de familia han sido analizadas desde la perspectiva del derecho a la intimidad. *Rexach vs. Ramírez*, 162 D.P.R. 130 (2004). Una de las dimensiones del derecho a la intimidad, plataforma sobre la cual descansa nuestro dictamen en *Figueroa Ferrer, ante*, y al que acude la mayoría para validar su determinación, tiene como finalidad precisamente reconocerle a los ciudadanos su autonomía en la adopción de decisiones personales. Véase, M. Galán Juárez, *Intimidad nuevas dimensiones de un viejo derecho*, Madrid, Editorial Universitaria Ramón Areces, 2004, pág. 130. Ello implica, inevitablemente, el reconocimiento de la libertad individual como vehículo para la elección y el desarrollo del propio plan de vida, por lo que la decisión de contraer matrimonio o de divorciarse incardina en la dimensión de autonomía del derecho a la intimidad. Es desde esta perspectiva que debe analizarse la controversia de confección judicial y que la mayoría hoy ignora.

Por el contrario, considero que los jueces debemos respetar la capacidad de las personas para regir sus destinos y los de sus familias por lo que no veo impedimento alguno a que, en casos apropiados, las partes puedan optar por liquidar sus bienes matrimoniales mediante un ordenado proceso de arbitraje. Considero, que "[a]postar por devolver el poder a las partes para que se responsabilicen de sus problemas y tomen las decisiones con las que tendrán que convivir durante años", es apostar porque los mecanismos no adversativos para solucionar

disputas se tornen en una realidad cotidiana en la sociedad procurando así que "el ciudadano sea más libre para elegir el modo en que quiere que se haga JUSTICIA." L. García Villaluenga, *Mediación en Conflictos Familiares, Una construcción desde el Derecho de familia*, Editorial Reus, Madrid, 2006, pág. 509. (Énfasis en original.)

Respecto la única controversia planteada por las partes, el razonamiento mayoritario nos parece confuso y poco convincente. No obstante, estoy de acuerdo con el resultado pero bajo otros fundamentos.

Pasemos a repasar someramente los hechos en este caso.

I

El Sr. Jorge Alfredo Vivoni Farage y la Sra. María de Lourdes Ortiz Carro obtuvieron un divorcio por consentimiento mutuo el 3 de junio de 1999. Como parte de las estipulaciones contenidas en la petición, acordaron que la división de la sociedad de gananciales se realizaría mediante un procedimiento de arbitraje. Luego de varios incidentes procesales, el 13 de marzo de 2001 se emitió un *Laudo Final Actualizado*. En éste se liquidaron todos los bienes gananciales, adjudicándosele a la Sra. Ortiz Carro una propiedad inmueble en Cidra (La Península), cuyo dominio tenía la corporación, Steri-Tech, Inc.

En cuanto a la adjudicación de La Península, el laudo establecía que ésta debía ser entregada a la Sra. Ortiz Carro libre de cargas y gravámenes "dentro de los treinta (30) días siguientes a la fecha de este laudo". De no transferir la propiedad en el término establecido, el Sr.

Vivoni estaría obligado a entregar la cantidad de $1,100,000 equivalente al valor en efectivo del inmueble. Así las cosas, el 6 de abril de 2001 el Sr. Vivoni le cursó una carta a la Sra. Ortiz Carro para concertar una fecha para realizar la transferencia del inmueble.

No obstante, la Sra. Ortiz Carro presentó una solicitud de revocación del laudo ante el Tribunal de Primera Instancia. El Sr. Vivoni solicitó entonces la modificación de éste con respecto a ciertas partidas. El tribunal de instancia declaró ambas peticiones no ha lugar. Ambos recurrieron al Tribunal de Apelaciones. Éste revocó las resoluciones del foro primario y ordenó que dicho tribunal examinara las alegaciones de ambos peticionarios. Luego de varios incidentes procesales, el 6 de diciembre de 2005 el Tribunal de Primera Instancia emitió una sentencia en la cual desestimó la impugnación de la Sra. Ortiz Carro, pero modificó varias partidas del *Laudo Final Actualizado*.

El 28 de diciembre de 2005, el Sr. Vivoni se comunicó nuevamente con la Sra. Ortiz Carro para otorgar las escrituras referentes a la transferencia de La Península. Sin embargo, la Sra. Ortiz Carro, aún inconforme, acudió al Tribunal de Apelaciones solicitando la revocación de la sentencia emitida por el foro primario. El tribunal apelativo confirmó el laudo, aunque modificó algunas partidas. Este Tribunal denegó revisar la sentencia del foro intermedio, y denegó igualmente las dos mociones de reconsideración presentadas por la Sra. Ortiz Carro. El mandato fue devuelto el 17 de julio de 2007.

El 28 de julio de 2007, el Sr. Vivoni solicitó a la Sra. Ortiz Carro reunirse para concretar la transferencia de La Península. El 1 de agosto de 2007, éste acudió al tribunal de instancia solicitando la ejecución parcial de la sentencia. Paralelamente, el 4 de octubre de 2007, la Sra. Ortiz Carro solicitó de ese tribunal la suma líquida de $1,100,000 correspondiente a la adjudicación de La Península, pues alegó que había pasado el término que establecía el Laudo para la transferencia, aun si se contaba desde la devolución del mandato al Tribunal de Primera Instancia. Este último, declaró con lugar la solicitud del Sr. Vivoni y emitió una Orden para la transferencia de los inmuebles. La Sra. Ortiz Carro reiteró su solicitud del 4 de octubre, pero el foro primario la declaró no ha lugar el 10 de diciembre de 2007.

La Sra. Ortiz Carro acudió al tribunal intermedio, alegando que había errado el tribunal de instancia al ordenar la transferencia de la propiedad y no el pago en efectivo, a pesar del lenguaje del laudo. Antes de que el tribunal apelativo expidiera el *certiorari*, el Tribunal de Primera Instancia emitió el mandamiento correspondiente para la firma de las escrituras, y el 4 de febrero de 2008 se concretó la transferencia, compareciendo el Sr. Vivoni en representación de Steri-Tech Inc. y el Alguacil del Tribunal en representación de la Sra. Ortiz Carro. Posteriormente, el Tribunal de Apelaciones revocó la sentencia del foro de instancia y declaró nulas las escrituras otorgadas, pues entendió que no se cumplió con

la entrega de la propiedad en  el término de 30 días establecido en el *Laudo Final Actualizado* de 13 de marzo de 2001.

Inconforme, el Sr. Vivoni acudió a esta Curia.  El 17 de julio de 2009, emitimos una orden de mostrar causa en la cual le ordenamos a la parte recurrida que se expresara sobre por qué no se debía expedir el auto y revocar el dictamen del foro apelativo intermedio.  La parte recurrida compareció y el Tribunal hoy resuelve conforme había intimado.

## II

Como indicamos al inicio, este Tribunal hoy resuelve que por exigencia de *Figueroa Ferrer v. E.L.A.*, *ante,* el mecanismo de arbitraje no está disponible para liquidar y adjudicar los bienes de la sociedad conyugal en ocasión de un divorcio por consentimiento mutuo.  El Tribunal indica que en *Figueroa Ferrer,* "destacamos que no se aceptaría petición alguna bajo dicha causal sin que las partes adjuntaran las estipulaciones sobre la división de bienes, el sustento de las partes y otras consecuencias del divorcio.  Esto en reconocimiento de la delicadeza de tales asuntos y, más aún, para asegurarnos de que la petición de divorcio no fuera producto de la irreflexión o de la coacción y hasta tanto la Asamblea Legislativa no prescribiera otras normas."

Con ello de trasfondo, la mayoría razona que en este caso "se desvirtuó el propósito de una de las normas establecidas" en *Figueroa Ferrer,* "utilizando la

estipulación para dirigir el pleito a un procedimiento de arbitraje, y las consecuencias que acarreó su mal uso." Continúa señalando que:

> "el proceso arbitral y judicial ha estado mediado por la falta de consenso entre ambas partes con relación a la liquidación de sus haberes. Por todo lo antes expuesto —y ante el hecho de que el uso del arbitraje en estos casos puede exacerbar otros problemas al no existir parámetros claros para su empleo en este tipo de relaciones— este Tribunal rechaza el uso de las estipulaciones para someter a arbitraje la partición y liquidación del caudal de la sociedad de bienes gananciales luego de decretado el **[d]ivorcio por la causal de consentimiento mutuo.** De lo contrario se dejarían inconclusos aspectos tan importantes y de suma delicadeza que deben ser resueltos a la hora de disolver el vínculo conyugal." (Énfasis en original.)

En otras palabras, el Tribunal estima que la liquidación y adjudicación de los haberes de una sociedad legal de gananciales no puede postergarse para un momento posterior al divorcio, sino más bien, que hay que liquidarla coetáneamente con la acción de divorcio cuando se invoca la causal de consentimiento mutuo. Indica además que "en Puerto Rico no existen parámetros para lidiar con los efectos económicos del divorcio mediante el arbitraje. Situación distinta sería el que la Asamblea Legislativa autorice su uso y establezca parámetros para estos casos."

Recapitulando, a base del razonamiento anterior podemos concluir que la mayoría considera que no es aceptable el arbitraje bajo los siguientes fundamentos: 1. Por exigencia de *Figueroa Ferrer, ante.* 2. Porque hubo en este caso falta de consenso. 3. Porque no existen parámetros claros para la utilización del arbitraje. 4.

Porque el asunto de la liquidación de los haberes conyugales es uno delicado que no puede posponerse para un momento posterior al divorcio.

Descartado el arbitraje como mecanismo para liquidar la sociedad legal de gananciales el Tribunal expresa lo siguiente:

> No obstante, debido al largo tiempo que lleva éste (sic) caso litigándose sería en extremo perjudicial para las partes involucradas, que descartemos el trámite arbitral y judicial que se ha suscitado por los pasados once (11) años. **Después de todo, la sentencia que lo estableció ya es final y firme.** Sin embargo, advertimos que no se favorece el uso desvirtuado del arbitraje **en los divorcios** y mucho menos el que los tribunales autoricen este tipo de estipulaciones en casos de divorcio por consentimiento mutuo. En esos casos, la estipulación debe contener lo relativo a la división de bienes. (Énfasis nuestro.)

Comencemos por el final. Si la sentencia que validó el mecanismo de arbitraje para liquidar la sociedad legal de gananciales en este caso es final y firme, como claramente lo es y así lo concluye la mayoría, ¿por qué este Tribunal está pasando juicio sobre ello y resolviendo que ése no era el mecanismo idóneo y que será impermisible su uso en casos futuros? **Máxime, cuando la disponibilidad del mecanismo de arbitraje para pautar la división de los haberes del matrimonio no fue uno de los errores que se nos planteara en el recurso instado.** Estamos ante una "controversia" de hechura judicial, para la cual este

Tribunal no ha provisto para que las partes se expresen previo a resolver.[26]

El dictamen de la mayoría nos plantea varias interrogantes: ¿Qué ha de ocurrir con las personas que se encuentren en este momento inmersas en un procedimiento de arbitraje porque así lo pactaron en las estipulaciones de divorcio sometidas y acogidas por el foro de instancia? ¿El divorcio decretado en estos casos es válido o es nulo? ¿Y si contrajeron nuevo matrimonio? Es alarmante que este Tribunal se adentre a resolver un asunto de trascendental importancia para el Derecho de familia y de severas repercusiones para quienes se encuentran actualmente involucrados en un proceso de divorcio, sin que el asunto

---

[26] Es doctrina reiterada de práctica apelativa, que los tribunales no habrán de considerar asuntos que no fueron planteados en los foros inferiores. Así, hace casi ochenta años dijimos que "[n]o es necesario que resolvamos o discutamos ninguna cuestión que no haya sido específicamente planteada por señalamiento de error ni abiertamente presentada por la argumentación en ninguno de los alegatos." *Banco Territorial y Agrícola v. Vidal*, 42 D.P.R. 869, 872 (1931). *Véanse además, entre otros*, *Misión Industrial de Puerto Rico v. Junta de Planificación*, 146 D.P.R. 64, 145 (1998); *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340, 351 (1990); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965); *Garaje Rubén, Inc. v. Tribunal Superior*, 101 D.P.R. 236, 242 (1973); *Autoridad sobre Hogares v. Sagastivelza*, 71 D.P.R. 436, 439 (1950).

Esta norma no obedece a una reverencia desmedida a los ritos procesales, sino más bien, a consideraciones de trato justo a las partes quienes no han tenido la oportunidad de presentar sus posiciones legales respecto a algún asunto. Hacer caso omiso de este principio milita en contra de la justiciabilidad del pleito, pues se prescinde de que los litigantes promuevan sus posturas vigorosamente ante el foro judicial. *Véase, Noriega v. Hernández Colón*, 135 D.P.R. 406, 427 (1994). Claro está, en situaciones extremas en las que aferrarse rígidamente a la norma ocasione a alguna de las partes un grave perjuicio, hay cabida para el ejercicio de la discreción y considerar un asunto no planteado. Ésta, claramente, no es la situación ante nuestra consideración.

que resuelve hubiese sido argumentado por las partes y sin haber ponderado los efectos de su dictamen, como es evidente ha ocurrido en este caso.

Por otro lado, en la cita antes transcrita, el tribunal indica que "no se favorece el uso desvirtuado del arbitraje **en los divorcios.**" (Énfasis nuestro.) ¿Acaso con esta expresión se está indicando que el arbitraje no está disponible para liquidar una sociedad de gananciales, independientemente de la causal para el divorcio? ¿O es que la norma pautada sólo aplica para divorcios por la causal de consentimiento mutuo? Interpreto la expresión del Tribunal como que aplica a todo divorcio. Si ese fuera el caso, ¿no habría que explicar por qué es necesario una norma tan dilatada, cuando la razón para descartar este mecanismo es lo resuelto en *Figueroa Ferrer*?

Regresemos entonces a evaluar los argumentos que anteriormente habíamos reseñado como fundamento del Tribunal para descartar el uso del arbitraje en el campo del Derecho de familia, específicamente, en casos de divorcio por consentimiento mutuo.

Como ya dijimos, el Tribunal considera que *Figueroa Ferrer, ante,* impide que se utilice el proceso de arbitraje para liquidar la sociedad legal de gananciales. No le adscribo tal alcance a lo allí expresado. Lo que dice *Figueroa Ferrer,* es que la petición de divorcio debe venir acompañada de "las estipulaciones correspondientes sobre la división de sus bienes." *Figueroa Ferrer, ante,* pág. 277. Pues bien, en estricto rigor, considero que eso fue lo que

ocurrió aquí. Las partes en este caso reconocieron en la estipulación suscrita la existencia de una comunidad de bienes compuesta por los haberes adquiridos durante el matrimonio e indicaron que esa comunidad se dividiría 50% para cada cual. Anejaron a dicho documento una lista de dichos bienes así como también de sus deudas. Las partes estipularon que, de no dividir la comunidad de bienes que expresamente habían reconocido en el convenio sometido al foro de instancia, se someterían a un proceso vinculante de arbitraje. Éstas establecieron detalladamente en el documento sometido a la consideración del juez las facultades del árbitro, cómo se seleccionaría y los términos que éste tendría para resolver los asuntos traídos a su atención. Además, dispusieron que el laudo sería firme e inapelable así como también que sus honorarios serían prorrateados entre las partes.

No hay duda que las partes estipularon --que no es otra cosa de convenir, concertar o acordar, *Diccionario de la Lengua Española*, Editorial Espasa Calpe, Madrid, 2001, pág. 998-- cómo se dividirían los bienes del matrimonio. Y utilizaron el mecanismo de un árbitro, cuyas facultades enumeraron en el documento, para llevar a cabo la adjudicación de tales bienes. Adviértase que en *Figueroa Ferrer, ante,* no exigimos que las partes liquidaran y adjudicaran los bienes de la sociedad antes de decretarse el divorcio o en el acto del divorcio, sino más bien, que estipularan sobre la división de sus bienes como requisito para el divorcio. Consideramos que esta lectura de nuestro

dictamen en *Figueroa Ferrer, ante,* es la que mejor se ajusta a los fundamentos que esgrimimos para validar el divorcio por consentimiento mutuo. Permite facilitar los procesos de divorcio para que las parejas puedan poner fin a la relación matrimonial que voluntariamente asumieron y que por infinidad de razones no desean continuar.

Otro de los argumentos de la mayoría para rechazar el uso del arbitraje como herramienta para la liquidar los bienes habidos en el matrimonio es que ello dejaría "inconcluso aspectos tan importantes y de suma delicadeza que deben ser resueltos a la hora de disolver el vínculo conyugal." Si ese fuera un argumento legítimo en derecho, considero entonces que el Tribunal debe ordenar que ello sea así **en todo divorcio, independientemente de la causal.** Habría que preguntarse por qué en casos de divorcio por otras causales como, por ejemplo, trato cruel, adulterio, o por separación, no se exige la liquidación y adjudicación de los bienes gananciales como requisito para decretar disuelto el vínculo matrimonial. ¿O es que la división y adjudicación de los bienes gananciales es un asunto "importante y delicado" sólo cuando las partes invoquen la causal de raigambre constitucional para el divorcio? ¿Por qué? ¿Qué hace distinto el proceso de divorcio por consentimiento mutuo que impone requisitos no exigibles en divorcios bajo otras causales? Nos parece, que en correcta metodología jurídica, este Tribunal viene obligado a enfrentarse a estas interrogantes para validar su conclusión.

A mi juicio, el Tribunal incurre en un aparente contrasentido al descartar el arbitraje para lidiar con los efectos económicos del divorcio pero no así para atender otros asuntos relacionados con el Derecho de familia. Me explico. En la opinión el Tribunal expresa lo siguiente: "Señalamos que de forma alguna rechazamos los beneficios que el arbitraje, **en aspectos esenciales de un divorcio o en otro tipo de disputas familiares,** pueda proporcionar." (Énfasis nuestro.) Con lo cual, el Tribunal parece avalar la utilización del mecanismo de arbitraje para atender algunos asuntos de Derecho de familia, pero sin explicarnos cuáles o qué parámetros se deben utilizar para considerar su utilización. ¿Se puede someter a arbitraje un conflicto relacionado con la custodia de unos menores, o de la patria potestad, o la relación materno o paterno filial, o incluso el propio divorcio siempre y cuando no sea por consentimiento mutuo? Estos asuntos, ¿son menos "importantes y delicados" que la división de los haberes acumulados durante el matrimonio que por eso se pueden resolver en arbitraje? Habría quien pudiera pensar todo lo contrario, que alguno de estos temas son aún más sensitivos que adjudicar unos bienes pues involucran a menores "que son más dignos de protección dada su edad y su falta de capacidad para gobernarse por sí mismo." E. Roca Trías, Crisis Matrimonial y Arbitraje, *Anuario Justicia Alternativa*, No. 6, 2005, 171, 177. Lo anterior, a mi juicio, ejemplifica la inconsistencia interna que trasluce la opinión avalada por la mayoría. Tal vez, ello es el

resultado de lo que adelantamos, de que las partes no han tenido una oportunidad de discutir y argumentar vigorosamente esta "controversia" y plantearnos todas sus posibles ramificaciones.

Antes bien, considero igualmente erróneo el razonamiento de la mayoría de que no procede el mecanismo alterno escogido por las partes porque "en Puerto Rico no existen parámetros para lidiar con los efectos económicos del divorcio mediante el arbitraje." No tiene razón el Tribunal. Primeramente, en este caso las partes convinieron específicamente los términos del proceso de arbitraje, nada quedó al azar o al arbitrio de una de las partes. No se puede aseverar entonces que no existían parámetros en este caso para atender la adjudicación de los bienes gananciales mediante arbitraje.

El mecanismo que exige el Tribunal fue el acordado por las partes en este caso. Por su importancia, citamos en su totalidad las disposiciones relativas al proceso de arbitraje incluidas en la estipulación suscrita por las partes:

> En los próximos diez (10) días contados a partir de que la Sentencia advenga final y firme los peticionarios escogerán por sorteo, de entre una terna de tres personas, un árbitro que atenderá todos los aspectos relativos a la liquidación y partición del caudal comunal.
>
> A esos fines, el árbitro queda facultado para: 1. Recibir prueba testifical, documental y pericial de los peticionarios; 2. Hacer las determinaciones de hechos y conclusiones de derecho que estime apropiadas; 3. Resolver planteamientos de evidencia y similares; 4. Citar testigos a las vistas. El árbitro atenderá toda

controversia relacionada a la partición y liquidación de la masa comunal.

El árbitro tendrá treinta días calendario para emitir su laudo a partir de que el caso quede sometido a su consideración, pero, nunca después del día 31 de diciembre de 1999.

El laudo que él emita será final, firme e inapelable para los peticionarios. Y sus honorarios serán prorrateados entre los peticionarios. Cada parte, además, pagará sus respectivos gastos legales.

Hasta tanto no se emita el laudo arbitral el que deberá rendirse para el día 31 de diciembre de 1999, la peticionaria co-administrará los bienes de la comunidad. Además, la peticionaria continuará recibiendo el rédito de $5,000.00 mensuales convenidos entre ellos. Dicho pago será efectuado en o antes de los días 15 de cada mes, y hasta las resultas del procedimiento de arbitraje o el día 31 de diciembre de 1999. Además, seguirá devengando los $2,500.00 por concepto de salario que percibe de la corporación. La interventora, Steri-Tech hará las retenciones mandatorias dispuestas por Ley.

Los peticionarios han convenido entre ellos que, de mediar caso fortuito o fuerza mayor que impida la emisión del laudo en o antes del día 31 de diciembre de 1999, el plazo se prorrogará por un término igual al que dure el mismo quedando prorrogados los acuerdos contenidos en esta petición por igual plazo.

No hay duda de que las partes que hoy se encuentran ante nosotros regularon adecuadamente el proceso de arbitraje a que se sometieron e impusieron los requerimientos básicos necesarios para que la herramienta adoptada operara de forma eficaz. Tan es así, que ninguna de ellas ha objetado el procedimiento de arbitraje y como éste fue conducido por el árbitro. Ello, a mi juicio, es indicativo de que independientemente de las posibles objeciones a uno de los múltiples asuntos atendidos y resueltos por el árbitro, ambas partes quedaron satisfechas

con el mecanismo que adoptaron para liquidar los haberes de la comunidad de bienes y cómo éste operó. No se puede concluir entonces que en este caso no existían guías adecuadas para conducir el procedimiento de arbitraje. Considero superada así la objeción expresada por la mayoría para negarle eficacia a este proceso no adversativo de resolución de conflictos en el campo del Derecho de familia. A mi juicio, nada impide, cara a la realidad que hoy vivimos, que convalidemos el acuerdo autocompositivo de las partes para procurar la liquidación de los haberes acumulados durante la vigencia de su matrimonio.

De otra parte, la aseveración en torno a la falta de parámetros parece no considerar la existencia del Reglamento de métodos alternos para la solución de conflictos, 4 L.P.R.A. Ap. XXIX, (el Reglamento) promulgado por el Tribunal Supremo para, precisamente, regular las herramientas alternativas como el arbitraje en los casos civiles instados en los tribunales de nuestro país. Considero que la mayoría debió explicar porque este Reglamento es inadecuado para regentar los procesos de arbitraje cuando se intenta adjudicar los haberes matrimoniales una vez decretado el divorcio.

El Reglamento declara como política pública de la Rama Judicial "fomentar la utilización de mecanismos complementarios al sistema adjudicativo tradicional con el fin de impartir justicia en una forma más eficiente, rápida y económica." 4 L.P.R.A. Ap. XXIX, R. 1.01. Entre los mecanismos que se regulan en el Reglamento está el

arbitraje, cuyo propósito se describe como la herramienta que permite "proveer a las partes la oportunidad de presentar su versión de los hechos, las teorías legales y la evidencia dentro de un procedimiento adjudicativo más rápido e informal que el judicial." 4 L.P.R.A. Ap. XXIX, R. 8.01(a). Dispone además, que las "partes tienen la potestad de decidir si se someten o no a este proceso." *Íbid.* El Reglamento indica que se podrán someter a arbitraje: **"todas las acciones de naturaleza civil** que no estén excluidas por estas reglas." (Énfasis nuestro.) 4 L.P.R.A. Ap. XXIX, R. 8.02. Ninguna de las exclusiones contenidas en la Regla 8.03 menciona los asuntos relacionados con la liquidación de una sociedad legal de gananciales. Por lo que, en principio y sujeto a la conformidad de las partes, el Reglamento permite el arbitraje en casos de liquidación y adjudicación de bienes gananciales.

Por otro lado, el Reglamento sí establece que el tribunal tendrá "discreción para excluir cualquier caso que no pertenezca a ninguna de las categorías" excluidas en las reglas cuando, "a su juicio, la naturaleza del caso, la complejidad de las controversias o cualesquiera otras circunstancias lo hagan inapropiado para arbitraje." 4 L.P.R.A. Ap. XXIX, R. 8.04(b). Por lo que aun cuando el Reglamento no impide se someta a arbitraje la liquidación y adjudicación de los haberes de una sociedad legal de gananciales, la determinación final sobre ese proceder dependerá de la ponderación que haga el juez de instancia

sobre su conveniencia en un caso en particular. Debemos suponer que cuando un juez concluye que un caso es idóneo para referirlo a arbitraje, es porque ha sopesado todos los factores que rodean la controversia y ha concluido que se sirve mejor los intereses de las partes refiriendo el asunto a un proceso de arbitraje para que sea allí donde dirimen los conflictos familiares.

No es correcto entonces postular que nuestro ordenamiento no provee mecanismos adecuados para regular los procesos de arbitrajes en casos de liquidación de los haberes gananciales. No obstante las disposiciones del Reglamento, el Tribunal guarda silencio de porque lo allí dispuesto no es adecuado o insuficiente para atender asuntos de esta naturaleza.

Finalmente, la propia Ley de Arbitraje de Puerto Rico, 32 L.P.R.A. secs. 3201 et sec., puede utilizarse, tal y como hace la mayoría en su dictamen, para regular un proceso de arbitraje de liquidación de sociedad legal de gananciales. No hay porque entonces denegar el alcance de su aplicación al Derecho de familia. Véase, R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, Universidad Interamericana de Puerto Rico, San Juan, vol I, 2002, págs.. 712-713.

Sostengo que en casos como el que tenemos ante nuestra consideración, una vez el juez se confronta con una petición de que la adjudicación de los haberes de la sociedad legal de gananciales se refieran a arbitraje éste debe, previo a prestarle su anuencia, ponderar los

siguientes factores: primero, cerciorarse de que las partes comprenden las consecuencias legales del divorcio; segundo, que éstos entienden las implicaciones de someter al proceso de arbitraje la liquidación de los haberes gananciales; tercero, que ninguna de las partes actúa bajo coacción; cuarto, que ambos poseen plena capacidad para actuar; quinto, que el convenio no lacera los principios y valores que animan el Derecho de familia o el llamado orden público familiar; y sexto, que el acuerdo claramente provea para que el laudo se emita conforme a Derecho y permita la revisión judicial.

Debemos resaltar que aún cuando este tipo de convenio constituye una manifestación de la tendencia moderna de validar la autonomía personal en la regulación de los asuntos íntimos personales y familiares, por lo que debemos considerarlos de forma favorable, su contenido no queda a la total merced de la autonomía negocial de las partes ya que el tema sobre el cual versa se refiere a delicados asuntos de familia. Es por ello que entiendo que el juez debe evaluar con rigor y bajo los criterios previamente señalados cualquier solicitud para remitir a arbitraje la liquidación de los haberes del matrimonio en ocasión de un divorcio. Véase, M. D. Díaz-Ambrona Bardaji, F. Hernández Gil, *Lecciones de Derecho de Familia*, Editorial centro de Estudios Ramón Areces, S.A., Madrid, 1999, pág. 219.

Hay que reconocer que en las situaciones derivadas del divorcio entran en juego las cuestiones más íntimas de las personas, las pasiones más enconadas y sensibles, junto a

los intereses más dignos de protección jurídica, por lo que éstas "son difíciles de armonizar y pocas resoluciones judiciales pueden dictarse con aspiración a resolver satisfactoriamente la situación de conflicto entre los cónyuges." Díaz-Ambrona Badalají, Hernández Gil, *op. cit*,, pág. 218. Ello, sin embargo, no puede ser el fundamento para rechazar y descartar de plano el proceso de arbitraje como mecanismo alterno para transigir las consecuencias de naturaleza puramente patrimonial que se derivan del divorcio, sino tal vez, todo lo contrario. Es correcto que no todo caso de liquidación de los haberes de la sociedad es el idóneo para referir a un proceso de arbitraje. Es por ello que el juez, previo a homologar una petición en tal sentido, debe cerciore que el convenio no es perjudicial para uno de los cónyuges utilizando los parámetros antes mencionados. Pero de lo que se trata es de dibujar con fino pincel las excepciones caso a caso, no de pintar con brocha ancha para vedarlo de nuestro ordenamiento. Y es que la utilización de métodos alternos de resolución de disputa como el arbitraje, "permite transformar los conflictos porque ayuda a enfrentar los problemas de forma colaborativa e implica un cambio en la aproximación: en lugar de buscar empeorar las alternativas de la otra parte para una negociación distributiva, se pueden aumentar las posibilidades de realizar ganancias conjuntas que puedan ser compartidas." García Villaluenga, *op. cit.*, pág. 149. A ello deberíamos aspirar.

III

Para concluir y muy someramente, una vez el Tribunal resuelve el asunto sobre el arbitraje pasa a atender lo relativo a cuándo un laudo es ejecutable. La ponencia indica que en la gran mayoría de los casos, los laudos arbitrales son ejecutados voluntariamente por las partes, pues como dice el artículo 21 de la Ley Núm. 376 de 1951, la validez de un laudo que de otro modo fuere válido no quedará afectada por el hecho de no presentarse una moción alguna para su confirmación. No obstante, en aquellas instancias en que las partes difieren sobre la validez o corrección del laudo, la Ley 376 brinda vías para obligar a su cumplimiento. Entre éstas, la Ley 376 permite entablar –en cualquier fecha dentro del año siguiente al laudo– un procedimiento sumario para la confirmación de éste ante el tribunal de instancia, el cual deberá emitir una sentencia confirmándolo, la cual es ejecutable de acuerdo a las Reglas de Procedimiento Civil. Igualmente, aquel que no esté de acuerdo con el laudo, puede –en un término de 3 meses desde que se le notifique el laudo– presentar una moción para revocar, modificar o corregir un laudo.

Sin embargo, la propia Ley 376 indica que ante una moción para revocar, modificar o corregir el laudo, el foro primario podrá suspender los procedimientos que la parte adversa a aquella que ha presentado la moción haya iniciado para ejecutar el laudo. *Véase,* 32 L.P.R.A. sec. 3224. Esto presupone que la parte adversa pudo comenzar el procedimiento de ejecución del laudo, aun cuando no hayan

transcurrido los términos para solicitar la revocación, modificación o corrección de éste. Por lo tanto, la opinión parece resolver que un laudo arbitral es ejecutable desde su emisión, sin perjuicio de que presentada una moción para solicitar su revocación, modificación o corrección, el foro primario pueda suspender dichos procedimientos.

En el caso de autos, la ponencia dice que ninguna de las partes solicitó la confirmación y ejecución del laudo tan pronto fue emitido. Su impugnación, en nada afectó las disposiciones referentes a La Península. Por lo tanto, la disposición que adjudicaba la propiedad a la Sra. Ortiz Carro era ejecutable desde la emisión del laudo. Sin embargo, aplicando la doctrina de actos propios, la opinión concluye que --debido a que fue por las impugnaciones presentadas por la Sra. Ortiz Carro que no se pudo ejecutar el laudo en el tiempo establecido en éste- ésta no puede beneficiarse de dicho incumplimiento. Por lo tanto, revoca la sentencia del Tribunal de Apelaciones y devuelve al Tribunal de Primera Instancia para que se determine si la corporación Steri-Tech Inc. realizó unas reparaciones que alegadamente debía hacer antes de transferir la propiedad.

En cuanto al resultado a que llega la mayoría de que el laudo es ejecutable desde que se emite considero que ello es cónsono con la finalidad que deben tener los laudos y con las disposiciones estatutarias de la ley de arbitraje, aunque en principio parecería ilógico permitir la ejecución de un laudo, mientras todavía otra de las

partes puede solicitar su corrección, modificación o inclusive su revocación. No obstante, la explicación de lo que ocurrió en este caso, y porqué debe aplicarse la doctrina de actos propios no es convincente.[27] Prefiero pensar que, puesto que el Sr. Vivoni solicitó a la Sra. Ortiz Carro el otorgamiento de las escrituras en abril de 2001, dentro de los 30 días originales, el hecho de que ella no contestó ese requerimiento y solicitó en mayo de 2001 la impugnación del laudo, es causa suficiente para invocar la doctrina de actos propios. Sin embargo, si el Sr. Vivoni no hubiese hecho nada dentro de los primeros 30 días, poco importaba que la Sra. Ortiz Carro hubiese luego impugnado el laudo, si ya se había incumplido la condición, partiendo de lo resuelto, esto es, que el laudo es ejecutable desde su emisión, por lo que los 30 días contaban desde el 13 de marzo de 2001. En cuyo caso, no tengo objeción a que el caso de devuelva al foro primario.


Anabelle Rodríguez Rodríguez
Juez Asociada

---

[27] Causa consternación que, ausente una determinación expresa de que se ha incurrido en mala fe procesal, se pueda penalizar a quien utilice un mecanismo procesal que tiene disponible. *Gutiérrez Vázquez v. Hernández Hernández,* 2007 TSPT 174. *Véase además*, J. Picó I. Junoy, *El Principio de la Buena Fe Procesal*, J.M. Bosch Editor, Madrid, 2003.