UNIVERSIDAD CATÓLICA DE PUERTO RICO, demandante, *v.* TRIAN-
GLE ENGINEERING CORP. y/o MAYAGÜEZ MECHANICAL CONTRAC-
TORS, INC. etc., demandados; MAYAGÜEZ MECHANICAL CON-
TRACTORS, INC., demandante y recurrida, *v.* TRIANGLE
ENGINEERING CORP. y SEABORD SURETY CO., demandada y
recurrente; VISSEPÓ & DIEZ CONSTRUCTION CORP., deman-
dantes, *v.* TRIANGLE ENGINEERING CORP. y UNIVERSIDAD CA-
TÓLICA DE PUERTO RICO, demandados.

*Número:* RE-93-118 Resuelto: 18 de mayo de 1994

*Gilberto Oliver Vázquez*, de *Quiluchini, Oliver, Medina & Gorbea*, abogado de los recurrentes; *Roberto Madera Acosta*, de *Madera & Toro*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

A finales de 1987 Triangle Engineering Corp. (en adelante Triangle), una corporación doméstica dedicada al negocio de la construcción,[1] fue escogida por la Universidad Católica de Puerto Rico (en adelante la Universidad) como su gerente de construcción en el proyecto de rehabilitación del campus universitario de Mayagüez. Como tal, entre otras funciones, evaluaría y seleccionaría a los contratistas que efectuarían la remodelación y la construcción. Triangle seleccionó, entre otros, a Mayagüez Mechanical Contractors, Inc. (en adelante Mayagüez Mechanical) para las instalaciones de la plomería y el aire acondicionado.

Antes de comenzar, la Universidad y Triangle *modificaron* su relación, pasando Triangle a fungir de contratista general en lugar de su gerente de construcción. En virtud de dicho acuerdo, Mayagüez Mechanical y los demás contratistas pasaron a ser subcontratistas de Triangle. No obstante haber sido denominada contratista general del proyecto, Triangle no construyó nada, encargándose dedicha labor Mayagüez Mechanical y los otros subcontratistas.

Terminada la obra, durante el proceso de liquidación, surgieron varias discrepancias entre la Universidad y Triangle sobre algunos trabajos de los subcontratistas, entre ellos Mayagüez Mechanical. La Universidad reclamó un crédito de cinco mil dólares ($5,000) por una alegada instalación defectuosa del aire acondicionado y se negó a

---

[1] Actualmente acogida a la protección de la Ley Federal de Quiebras (11 U.S.C. secs. 361–520).

reconocer una orden de cambio aditiva de aproximadamente ocho mil dólares ($8,000).

Estas controversias impidieron la inmediata liquidación de la obra y el desembolso del dinero retenido. Acorde a ciertas disposiciones contractuales, la Universidad y Triangle[2] decidieron someterlas a arbitraje. Próximo a iniciarse ese trámite, fueron demandadas por Mayagüez Mechanical en cobro de veintiocho mil cuatrocientos setenta y siete dólares ($28,477) por concepto de los trabajos de plomería y aire acondicionado. También fue demandada la Seaboard Surety Co. (en adelante Seaboard), fiadora de Triangle.

La Universidad negó tener relación contractual alguna con la demandante Mayagüez Mechanical y, mediante el mecanismo de la Regla 19 de Procedimiento Civil, 32 L.P.R.A. Ap. III (obligar a litigar reclamaciones adversas entre sí (*interpleader*)), consignó setenta y siete mil ochocientos treinta y dos dólares con cincuenta y tres centavos ($77,832.53) en el Tribunal Superior, Sala de Mayagüez, como liquidación parcial del proyecto. Reconoció adeudar una suma adicional que sería fijada por mutuo acuerdo entre las partes en arbitraje. Mediante estipulación, la suma consignada fue posteriormente desembolsada a los subcontratistas, correspondiendo a Mayagüez Mechanical diecisiete mil ochocientos treinta y dos dólares concincuenta y tres centavos ($17,832.53).

Triangle rechazó responsabilidad. Alegó también que Mayagüez Mechanical había incumplido con las especificaciones del contrato y declaró desconocer la cantidad adeudada. Además, Triangle y Seaboard solicitaron la suspensión de los procedimientos y que la reclamación se remitiera a arbitraje.

El Tribunal Superior consolidó las reclamaciones de los

---

[2] El Art. 4.5.1 del contrato de construcción entre la Universidad Católica de Puerto Rico y Triangle Engineering Corp. expresa que todas las reclamaciones, disputas y otras materias que surjan o estén relacionadas al contrato o a su incumplimiento serán resueltas mediante arbitraje conforme a las Reglas de Arbitraje para la Industria de la Construcción promulgadas por la Asociación Americana de Arbitraje.

subcontratistas y suspendió los procedimientos judiciales hasta tanto las controversias fueran sometidas a arbitraje. No obstante esa orden, los subcontratistas no comparecieron al arbitraje. Igualmente, la Universidad expresó no estar dispuesta a arbitrar en presencia de los subcontratistas. Esto provocó que Triangle solicitara una orden para compeler a arbitraje, sin embargo, el foro judicial se reservó su decisión hasta evaluar la contención de los subcontratistas de que entre éstos y Triangle no había nada que arbitrar. Previa discusión al efecto, el tribunal denegó una solicitud de sentencia sumaria de Mayagüez Mechanical, detectando una controversia "sobre las cantidades adeudadas bajo el contrato de construcción, sobre la procedencia de órdenes de cambio aditivas de Mayagüez Mechanical Corp. por $11,460 la cual el dueño no ha reconocido en la referida liquidación, mientras Triangle estima que la cantidad correcta es $8,000. Existe controversia sobre la corrección de la instalación que realizó Mayagüez Mechanical Corp. de ciertas máquinas de aire acondicionado en el proyecto en la que el dueño reclama un crédito por $5,000". *Exhibit* 21, pág. 2. Nada se dispuso en cuanto al arbitraje, reservándose esa determinación para una vista posterior. En ésta, Triangle reconoció adeudar siete mil ciento veinticinco dólares y sesenta y nueve centavos ($7,125.69) a Mayagüez Mechanical, pero calificó como contingente a la deducción que reclamaba de cinco mil dólares ($5,000) por la alegada mala instalación del equipo de aire acondicionado y al reconocimiento de una orden de cambio por ocho mil dólares ($8,000) no reconocida por la Universidad. En esa etapa el tribunal tampoco resolvió la solicitud de arbitraje.

Mayagüez Mechanical presentó una tercera moción de sentencia sumaria reproduciendo virtualmente los mismos argumentos. Esta vez el tribunal accedió (Hon. Juan Camacho Fabre, Juez), al estimar que no existían controversias sobre los hechos siguientes:

Los codemandados Triangle y la Universidad Católica suscribieron un contrato de construcción y servicios mediante el cual el primero se obligaba a la construcción del Proyecto Universidad Católica, Recinto de Mayagüez.

El día 25 de abril de 1988 la codemandada Triangle subcontrató a la demandante para realizar trabajos de plomería y aire acondicionado del Proyecto Universidad Católica, Recinto de Mayagüez.

El día 11 de julio de 1989, el Dr. Jiménez de la firma Jiménez & Jiménez, Consultores de la Universidad Católica, cursó comunicación al Ing. Vázquez representante de la Universidad Católica aceptando los cambios en órdenes sometidas por la parte demandante a través de Triangle.

Para el día 27 de julio de 1989, el Ing. Carlos M. Monserrate, representante de Triangle en la construcción del proyecto otorgó documento titulado "Substantial Completion" que establece que el "Academic Building" fue aceptado para ocupación el día 30 de enero de 1989 y el "Students Activity Center" el día 30 de abril de 1989.

El día 17 de abril de 1990, el Ing. Aponte, representante de ventas de York International, certifica que la instalación de las unidades de aire acondicionado que sirven a la biblioteca fueron hechas según las recomendaciones del manufacturero.

El día 8 de febrero de 1991, el Ing. Armengol Iglesias, quien fuera inspector de la Universidad Católica, suscribió declaración jurada a los efectos que los trabajos realizados por la demandante fueron efectuados de acuerdo a planos y especificaciones.

El día 25 de febrero de 1991, el Ing. Monserrate, representante de Triangle Corp. en la construcción del proyecto suscribió declaración jurada a los efectos que los trabajos habían sido terminados y que en las diferencias a corregirse señaladas no hubo alguna en relación a la instalación de las unidades de la biblioteca.

El día 13 de septiembre de 1990 la codemandada Triangle abonó a la demandante la suma de $17,832.53. *Exhibit* 1, págs. 4-5.

Como resultado el tribunal condenó a Triangle y Seaboard a pagar solidariamente a Mayagüez Mechanical catorce mil ochocientos ochenta y siete dólares con setenta y tres centavos ($14,887.73) por los trabajos efectuados y el equipo instalado en el proyecto, además del interés legal vigente que ha de ser computado sobre la cuantía de la sentencia desde el momento de ser dictada hasta su

satisfacción. Asimismo, les impuso las costas y cinco mil dólares ($5,000) de honorarios de abogado. A solicitud de Seaboard, revisamos.([3])

## II

El señalamiento relativo al arbitraje requiere examinar la relación contractual entre las partes. El Art. 5.3.1 de las Condiciones Generales del contrato entre la Universidad y Triangle dispone que cada subcontratista, en la medida del trabajo a ser ejecutado, *está ligado* al contratista por los términos de los documentos contractuales y asume hacia éste todas las obligaciones y responsabilidades que, a tenor con dichos documentos, tiene el contratista hacia el dueño y arquitecto.

Así, el Art. I del subcontrato entre Triangle y Mayagüez Mechanical impone a ésta efectuar los trabajos encomendados acorde a los términos del contrato entre la Universidad y Triangle, el cual forma parte del referido subcontrato de construcción. También estipula que Mayagüez Mechanical se obliga hacia Triangle bajo los términos del contrato principal; igualmente, tiene hacia Triangle todas las obli-

---

([3]) Señala:

"A. Erró el Honorable Tribunal de Instancia al no suspender los procedimientos ante sí en vista a los convenios contractuales entre las partes, y al no remitir las controversias de este caso para ser dilucidadas dentro de un procedimiento de arbitraje, dictando en su lugar la Sentencia Sumaria.

"B. Erró el Honorable Tribunal de Instancia al dictar sentencia por la vía sumaria, ignorando al así hacerlo, las claras controversias de hechos que surgen de la documentación, declaraciones juradas y admisiones que obran en el récord, las cuales impiden que el presente caso se despache mediante dicha vía.

"C. Erró el Honorable Tribunal de Instancia al no desestimar la reclamación de la Demandante, por no ser la misma exigible conforme a los términos contractuales acordados entre las partes.

"D. Erró el Honorable Tribunal de Instancia al conceder a la demandante en su sentencia, sumas en exceso a las reclamadas por esta en su demanda y en desacuerdo con los propios términos de la Sentencia y al imponer en dicha sentencia, el pago de intereses sobre intereses.

"E. Erró el Honorable Tribunal de Instancia al conceder en su sentencia honorarios de abogado, o al concederlos en forma excesiva, vistas las defensas de la Recurrente, y en los pronunciamientos de esta Superioridad en el caso de *Corpak, Inc. v. Ramallo Brothers*, 90 JTS 37." Solicitud de revisión, pág. 12.

gaciones que, en virtud del contrato de construcción, asume ésta hacia la Universidad. Art. X(1). Dicha imbricación entre las partes contratantes se extiende hasta conferir a la Universidad la autoridad final para aceptar o rechazar el trabajo de Mayagüez Mechanical. Art. X(18).

Aclarada la relación contractual entre las partes, veamos las cláusulas sobre arbitraje en el contrato y subcontrato.

De entrada, notamos que dichas cláusulas son *prácticamente idénticas*, tanto en el contrato de construcción entre Triangle y la Universidad como en el subcontrato entre aquélla y Mayagüez Mechanical; sus Arts. 4.5.5 y 7.9.1, respectivamente, disponen que ningún procedimiento de arbitraje incluirá a otros, excepto el dueño, contratista y aquellas personas involucradas sustancialmente en una cuestión común de hecho o de derecho, y cuyas presencias sean requeridas si se pretende dar en ese proceso un remedio completo.

El subcontrato dispone, en su Art. X, párrafos 27 y 28, que el contratista deberá dar al subcontratista la oportunidad de someter evidencia en cualquier procedimiento de arbitraje que envuelva sus derechos. Asimismo, provee para el nombramiento como árbitro en los procedimientos de la persona nominada por el subcontratista, si la única causa de disputa es el trabajo ejecutado por éste.

En las anteriores disposiciones contractuales, la recurrente Seaboard fundamenta la arbitrabilidad de las controversias. Argumenta que ciertas discrepancias en cuanto al trabajo de Mayagüez Mechanical crearon controversias entre el dueño de obra y el contratista, que impidieron la liquidación de la obra, razón por la cual la Universidad ha negado el pago final a Triangle quien, a su vez, no lo ha hecho a Mayagüez Mechanical.[4] Sostiene que a

---

[4] La responsabilidad del contratista de efectuar pagos al subcontratista por la labor realizada por éste surge una vez el dueño de la obra ha pagado al contratista. Ver cláusula X(20) y (23) del subcontrato, párrafo 5 de la Descripción del Trabajo y

tenor con el citado Art. 4.5.1,(⁵) la controversia es arbitrable. Aduce que resolver lo contrario podría redundar en la indeseable situación de que Triangle tuviera que defender en un procedimiento de arbitraje ante la Universidad la reclamación de Mayagüez Mechanical en su ausencia y sin su asistencia, a la vez que tendría que litigar lo mismo en un pleito judicial con Mayagüez Mechanical, con la posibilidad de que se obtuvieran resultados contradictorios y encareciera la solución de las controversias.

Mayagüez Mechanical, si bien reconoce la existencia de una cláusula de arbitraje en su contrato con Triangle, aduce que no había controversia real para someter dicho procedimiento.

## III

■ Nuestro ordenamiento legal dispone que "[d]os o más partes podrán convenir por escrito en someter a arbitraje ... cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio". 32 L.P.R.A. sec. 3201.

■ En *McGregor-Doniger v. Tribunal Superior*, 98 D.P.R. 864, 869 (1970), expresamos que existe una fuerte política en favor del arbitraje y que toda duda respecto a la existencia o no de dicho procedimiento debe resolverse a su

---

Condiciones Especiales; cláusula 9.5.2 de las Condiciones Generales del Contrato de Construcción.

(⁵) Se fundamenta en la parte que se refiere a todas las reclamaciones, disputas y otras materias en cuestión que surjan de o estén relacionadas al contrato o a su incumplimiento.

favor. Así lo reafirmamos recientemente en *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352 (1990).

 Ante un convenio de arbitraje lo prudencial es la abstención judicial, aunque esa intervención no esté vedada .([6])

La recurrida Mayagüez Mechanical hace hincapié en que nuestra Ley de Arbitraje provee dicha solución de disputas sólo en casos en que hay controversias, y aquí el ilustrado foro de instancia dictó sentencia sumaria por no encontrar controversia en los hechos materiales. No podemos acoger su interpretación. Avalarla atentaría contra la esencia de este mecanismo que, como hemos visto, es favorecido judicialmente. Rehusamos otorgar igual acepción a la palabra *controversia* en el ámbito de sentencias sumarias al de materia de asuntos arbitrables.

 En este caso, permitir que el tribunal resuelva *sumariamente* una disputa *arbitrable*, y determinar correcto que la ausencia de hechos materiales encontrada por el tribunal implica que desaparece su arbitrabilidad, sería un subterfugio que vulneraría la eficacia del arbitraje como método alterno. *Es al árbitro a quien correspondía determinar si existía controversia de hechos y adjudicar la materialidad de los mismos.*([7])

---

([6]) La propia ley dispone que "[s]i cualquiera de las partes de un convenio escrito de arbitraje incoare acción u otro recurso en derecho, el tribunal ante el cual dicha acción o recurso estuviere pendiente, una vez satisfecha de que cualquier controversia envuelta en dicha acción o recurso puede someterse a arbitraje al amparo de dicho convenio, dictará, a moción de cualquiera de las partes del convenio de arbitraje, la suspensión de la acción o recurso hasta tanto se haya procedido el arbitraje de conformidad con el convenio". 32 L.P.R.A. sec. 3203.

([7]) "El árbitro tiene poderes *amplios* para determinar cuestiones de hecho y de derecho así como de procedimiento." (Traducción nuestra.) R. Coulson, *Business Arbitration—What you Need to Know*, 3ra ed., Nueva York, American Arbitration Association, 1986, pág. 25.

El mismo autor expresa que "se espera que los árbitros escuchen toda la evidencia que sea pertinente a una controversia. Como tienen que determinar por ellos mismos lo que es pertinente, los árbitros están inclinados a aceptar evidencia que podría no ser admitida por los jueces.... Las reglas de la A.A.A. proveen que 'el árbitro será el juez de la pertinencia y materialidad de la evidencia ofrecida, y su conformidad a las reglas de evidencia no será necesaria' ". (Traducción nuestra.)

Rechazamos utilizar términos y parámetros estrictamente judiciales en el ámbito de arbitraje; aunque ambos tienen el propósito principal de resolver disputas, el énfasis de sus procedimientos es distinto.[8]

■ El interés estatal en promover el arbitraje como método para solucionar disputas se ve reflejado, además, en la presunción de arbitrabilidad cuando el contrato tiene una cláusula de arbitraje. En esas circunstancias, las "dudas deben resolverse a favor de dicha cobertura". (Traducción nuestra.) *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650 (1985).

Además de esa presunción, hay un interés de promover

---

Coulson, *op. cit.*, págs. 19–20.

Nuestra jurisprudencia establece claramente que "no es revisable en su fondo el error de los árbitros en la apreciación de los hechos o en las normas de un derecho independientemente del sentir concurrente o disidente del foro judicial ...; no son revisables tampoco señalamientos de errores que conllevan considerar en sus méritos cuestiones de hecho sobre la interpretación de un contrato y la prueba recibida por los árbitros —*Autoridad sobre Hogares*, supra, pág. 363". *C.R.U.V. v. Hampton Dev.*, 112 D.P.R. 59, 64 (1982).

No obstante, cuando las partes acuerden que los asuntos sometidos a arbitraje sean resueltos con arreglo a derecho, el tribunal puede revisar los méritos jurídicos *del laudo. Rivera v. Samaritano & Co., Inc.*, 108 D.P.R. 604, 608 (1979). Aún así, "el tribunal de instancia no debe inclinarse fácilmente a decretar la nulidad del laudo a menos que efectivamente el mismo no haya resuelto la controversia con arreglo a derecho, según lo pactaran las partes.... Debe tenerse presente que una discrepancia de criterio con el laudo no justifica la intervención judicial pues destruye los propósitos fundamentales del arbitraje de resolver *las controversias rápidamente, sin los costos y demoras del proceso judicial". Rivera v. Samaritano & Co., Inc.*, supra, pág. 609.

La cláusula de arbitraje en este caso refleja la intención de que el laudo sea conforme a derecho, pues provee para la revisión judicial. No obstante, no se puede privar ab initio al árbitro de entender en las controversias. Aparte de la participación limitada del tribunal que propugna *Rivera v. Samaritano & Co., Inc.*, supra, la cláusula de arbitraje priva a los tribunales de jurisdicción en los casos de la cláusula 4.3 .5, entre las cuales se encuentra lo pertinente a "falta del trabajo en cumplir con los requisitos del contrato". (Traducción nuestra.) Coulson, *op. cit.*, pág. 15.

[8] "En la litigación, el énfasis está en el procedimiento. La maquinaria judicial está diseñada para corregir los errores. Se supone que el procedimiento proteja a las partes contra los errores, con la revisión apelativa jugando un papel importante.

"En el arbitraje las partes descansan en su propia habilidad para seleccionar a un adjudicador sabio e imparcial. Ellas (las partes) renuncian a su derecho a tener un juez que revise la decisión del árbitro. El énfasis está en la integridad y experiencia del adjudicador. Las partes seleccionan el arbitraje porque desean un juicio informado, aplicado y obtenido a través de un procedimiento simplificado de vista. Ellas (las partes) pretenden que el resultado sea final. El énfasis está en la substancia, en lugar de en el procedimiento." (Traducción nuestra.) Coulson, *op. cit.*, pág. 16.

las cláusulas de arbitraje contractuales. *AT & T Technologies, Inc. v. Communications Workers,* supra, págs. 648–649. "Es un corolario necesario del principio de que 'el arbitraje es una materia de contrato' pues cuando las partes han provisto que un tipo particular de disputa debería ser arreglada en arbitraje, en lugar de en litigación, un tribunal no vulnerará dicho acuerdo decidiendo por sí mismo la disputa." (Traducción nuestra.) *Nat. R. Passenger Corp. v. Boston and Maine Corp.,* 850 F.2d 756, 759 (Cir. D.C. 1988), citado en *World Films, Inc. v. Paramount Pict. Corp.,* supra.

Según expresáramos en *World Films, Inc. v. Paramount Pict. Corp.,* supra, pág. 361 esc. 9, "[e]n *National R.R. Passenger Corp. v. Boston S. Maine Corp.*[, supra], el tribunal elaboró una interesante distinción entre tres categorías de controversias arbitrables: (1) controversias en torno a la formación del contrato (la determinación de si las partes acordaron someterse a arbitraje); (2) controversias en torno a la amplitud del contrato (determinación de cuáles son las controversias que las partes pactaron arbitrar); y (3) controversias sobre la duración (determinación de si las partes acordaron someter a arbitraje la duración o expiración del contrato)". Señala el tribunal en *National R.R. Passenger Corp. v. Boston S. Maine Corp.,* supra, que en cuanto a dichas categorías el tribunal puede averiguar la intención de las partes. Aplicando dicha normativa al caso de autos, vemos que no hay controversia en cuanto a alguna categoría análoga a una de las enumeradas en el citado caso federal. Por lo tanto, la incursión del juez al determinar que no había controversia en cuanto a hechos materiales menoscabó la raíz misma del poder del árbitro bajo el contrato.[9]

---

[9] En la nota 1 vimos que las cláusulas de arbitraje sostienen que las controversias serán resueltas mediante arbitraje acorde con las Reglas de Arbitraje para la Industria de la Construcción promulgadas por la Asociación Americana de Arbitraje. Según las mismas, un árbitro tiene amplios poderes, que incluyen la autoridad para:

# IV

Como apuntamos, en el trasfondo fáctico del caso de autos el propio juez que dictó la sentencia la había declarado sin lugar antes por entender que existían *varias controversias de hecho*. Posteriormente, varió ante los mismos hechos básicos.

Los documentos que obran en autos reflejan una clara controversia en cuanto a los hechos materiales. *Primero*, Mayagüez Mechanical alega la existencia de una orden de cambio aditiva en la cantidad de once mil cuatrocientos sesenta dólares ($11,460). La recurrente Seaboard, sin embargo, señala que la cantidad correcta es de ocho mil dólares ($8,000), conforme convenio de ambas partes.[10] Por otro lado, existe controversia sobre la corrección en la instalación de unas máquinas de aire acondicionado,[11] además de problemas con varios compresores.

Forman parte de los autos del caso, tanto el contrato de construcción como el subcontrato entre las partes. De ambos documentos surge la responsabilidad de corregir todo trabajo deficiente y no conforme a las especificaciones, además de períodos de garantía. Igualmente, se delinea el pro-

"considerar enmiendas a la demanda o reconvención (sección 8); programar, cerrar y reabrir vistas (secciones 21, 35 y 36); determinar si alguna persona no envuelta directamente puede asistir a la vista (sección 25); conceder o denegar posposiciones de vista (sección 26); y conducir un arbitraje en ausencia de una parte luego de debida notificación (sección 30). Cuando esté autorizado por ley a así hacerlo, el árbitro podrá citar testigos o documentos independientemente o a requerimiento de una parte (sección 31). El árbitro también puede recibir, considerar y pesar cualquier evidencia incluyendo evidencia de testigos por afidávit (secciones 31 y 32); conducir una vista del sitio del proyecto (sección 33); ordenar la salvaguarda de cualquier propiedad sujeta a la disputa durante la pendencia de las vistas de arbitraje (sección 34); conceder interés en el laudo (sección 43); fijar los costos y gastos del árbitro por igual o a favor de alguna parte (sección 51); y determinar controversias de arbitrabilidad (sección 53)." Coulson, *op. cit.*, págs. 54–55.

[10] Véase Memorando de 11 de julio de 1989 sobre certificación de cambios de plomería y muro de retención en proyecto de Mayagüez (*Exhibit* C) y Minuta del Tribunal Superior de 14 de enero de 1992.

[11] Véanse las cartas enviadas por el dueño fechadas 5 de diciembre de 1989, 28 de marzo de 1990 y 11 de junio de 1990, y por Triangle Engineering Corp. el 14 de mayo de 1990.

cedimiento de liquidación de la obra mediante el cual se permite la retención de cantidades hasta que se corrija el trabajo no conforme. *El arbitraje es un imperativo.*

*Se dictará sentencia revocatoria y se remitirá el caso al procedimiento de arbitraje contractualmente pactado.*[12]

El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Rebollo López no intervino.

---

[12] Esta decisión hace innecesario pronunciarnos sobre los restantes señalamientos de error.