Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| UNIVERSIDAD DE PUERTO RICO<br><br>*Peticionario*<br><br>v.<br><br>SINDICATO DE TRABAJADORES DE LA UNIVERSIDAD DE PUERTO RICO<br><br>*Recurrido* | KLCE202300448 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2022CV01275<br><br>Sobre: Impugnación de Laudo de Arbitraje |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Santiago Calderón y la Jueza Álvarez Esnard

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2023.

Comparece ante nos la Universidad de Puerto Rico (UPR o parte peticionaria) mediante recurso de *Certiorari* y solicita la revisión de la *Sentencia* emitida el 20 de marzo de 2023, notificada el 27 de marzo de 2023, por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario). Mediante el referido dictamen, el TPI confirmó el Laudo de Arbitraje emitido el 22 de enero de 2022 por el árbitro designado por el Negociado de Conciliación y Arbitraje (Negociado) del Departamento del Trabajo y Recursos Humanos de Puerto Rico (DTRH) y, en consecuencia, declaró No Ha Lugar la *Petición de Revisión de Laudo* presentada por la parte peticionaria.

Por los fundamentos que expondremos a continuación, **expedimos** el auto de *certiorari* y **confirmamos** la *Sentencia* apelada.

**I.**

La controversia ante nuestra consideración tiene su origen el 16 de junio de 2021, cuando la UPR le informó al Sindicato de

Trabajadores de la Universidad de Puerto Rico (Sindicato o parte recurrida), mediante una misiva, que, como parte del Plan Fiscal requerido por la Junta de Supervisión Fiscal, la Junta de Gobierno le requirió a la UPR establecer un plan dirigido a incluir a todos los empleados universitarios en el mismo plan médico a partir del 1 de agosto de 2021[1].

Seguidamente, el 17 de junio de 2021, el Sindicato contestó la comunicación emitida por la UPR[2]. Adujo que el Plan Fiscal no contempla requerimiento alguno que sustente la afirmación de que la UPR y la Junta de Gobierno de la UPR no tienen facultad para modificar ni eliminar unilateralmente disposición alguna del Convenio Colectivo vigente entre el Sindicato y la UPR.

No obstante, el 2 de julio de 2021, la Junta de Gobierno de la UPR remitió una misiva en la que informó al Sindicato que, el 26 de junio de 2021, se aprobó la Certificación No. 129 2020-2021 mediante la cual se estableció lo siguiente:

> *Dejar sin efecto lo dispuesto en el Artículo 77, Incisos A y G, de la Certificación Núm. 54 (2014-2015), conocida como "Reglas y condiciones de trabajo suplementarias a la reglamentación vigente para el personal de mantenimiento, construcción y servicios agrícolas de la Universidad de Puerto Rico", con respecto a los servicios médicos. Los empleados que pertenecen a la unidad apropiada que representa el Sindicato de Trabajadores, participarán del Plan Médico Único, auspiciado por la Universidad de Puerto Rico para todos sus empleados.*
>
> *Disponer que la presente Certificación será vigente a partir del 1ro de julio de 2021. Desde esa fecha, deja sin efecto cualquier certificación, norma, disposición o determinación que sea contraria a la misma[3].*

Posteriormente, el 6 de agosto de 2021, el Sindicato presentó una *Querella* ante el Negociado del DTRH. Alegó que se produjo una violación del Convenio Colectivo entre las partes y Ley Núm. 1 de 20 de enero de 1966, según enmendada, conocida como *Ley de la Universidad de Puerto Rico*[4], debido a que la Junta de Gobierno de

---

[1] Véase apéndice del recurso de *Certiorari*, pág. 267.
[2] Véase apéndice del recurso de *Certiorari*, pág. 268.
[3] Véase apéndice del recurso de *Certiorari*, págs. 269-270.
[4] 18 LPRA sec. 601 nota, *et seq.*

la UPR eliminó unilateralmente el Artículo 77 del Convenio sin notificarle previamente y sin negociar con el Sindicato. Sostuvo que, al eliminar el referido artículo, el patrono les impuso a los empleados del Sindicato tener que acogerse al plan médico institucional.

Así las cosas, el 29 de septiembre de 2021, se celebró la vista de arbitraje a la que ambas partes comparecieron con sus representantes legales. Luego de la vista, el Negociado le ordenó a las partes que sometieran sus respectivos alegatos en apoyo a su posición. El caso quedó sometido el 8 de noviembre de 2021.

Consecuentemente, el 25 de enero de 2022, el árbitro, Benjamín J. Marsh Kennerley (Árbitro), emitió el *Laudo de Arbitraje*[5], mediante el cual determinó lo siguiente:

> [...] la Universidad violó el acuerdo entre las partes; al eliminar unilateralmente el Artículo 77 del Convenio Colectivo y al incluir a los empleados de mantenimiento, construcción y servicios agrícolas en mismo plan médico de todos los demás empleados de la Universidad[6].

Inconforme, el 24 de febrero de 2022, la parte peticionaria acudió ante el TPI mediante una *Petición de Revisión de Laudo*[7]. Alegó que el Sindicato es una agrupación bona fide y no una unión, por lo que lo dispuesto en sus Reglas Suplementarias pueden modificarse unilateralmente por la parte peticionaria. Así, solicitó la revocación del Laudo dictado por el Árbitro el 25 de enero de 2022.

El 26 de abril de 2022, la parte recurrida presentó su *Oposición a Solicitud de Revisión de Laudo de Arbitraje*[8]. En esencia, arguyó que los argumentos presentados por la UPR son totalmente improcedentes y no se sostienen bajo ninguna teoría de hecho o derecho.

Luego de evaluar los argumentos de las partes, el 20 de marzo de 2023, notificada el 27 de marzo de 2023, el TPI emitió *Sentencia*[9],

---

[5] Véase apéndice del recurso de *Certiorari*, págs. 1-15.
[6] Véase apéndice del recurso de *Certiorari*, pág. 14.
[7] Véase apéndice del recurso de *Certiorari*, págs. 747-771.
[8] Véase apéndice del recurso de *Certiorari*, págs. 772-787.
[9] Véase apéndice del recurso de *Certiorari*, págs. 788-790.

mediante la cual "concluye y resuelve que la determinación cumple con las normas jurisprudenciales vigentes por lo que este tribunal la considera correcta". En consecuencia, el foro primario confirmó el Laudo y declaró No Ha Lugar la solicitud de revisión.

Insatisfecho aún, el 24 de abril de 2023, la UPR presentó el recurso de epígrafe e imputó al TPI la comisión de los siguientes errores:

A. ERRÓ MANIFIESTAMENTE EL TPI AL DETERMINAR QUE LOS ARGUMENTOS ESBOZADOS POR LA UNIVERSIDAD PARA IMPUGNAR EL LAUDO SE CIRCUNSCRIBEN A SU INCONFORMIDAD CON LA DECISIÓN QUE EMITIÓ EL ÁRBITRO EN VIRTUD DE LA PRUEBA DESFILADA Y LA APRECIACIÓN QUE DE ÉSTA REALIZÓ EL ÁRBITRO, CUANDO EL PLANTEAMIENTO DE LA UNIVERSIDAD ES QUE EL LAUDO NO ES CONFORME A DERECHO.

B. ERRÓ MANIFIESTAMENTE EL TPI AL CONCEDER DEFERENCIA A UN LAUDO QUE ES CLARAMENTE CONTRARIO A DERECHO.

C. ERRÓ MANIFIESTAMENTE EL TPI AL CONCEDER DEFERENCIA, SIN REALIZAR UNA EVALUACIÓN MINUCIOSA, A UNAS DETERMINACIONES DE HECHO DEL ÁRBITRO QUE NO ENCUENTRA APOYO EN LA EVIDENCIA DESFILADA, LO CUAL ES ERROR DE DERECHO.

D. ERRÓ MANIFIESTAMENTE EL TPI AL CONCEDER DEFERENCIA, SIN REALIZAR UNA EVALUACIÓN MINUCIOSA, A LA DETERMINACIÓN DEL ÁRBITRO QUE EL SINDICATO ES UNA UNIÓN, CONTRARIO A LA EVIDENCIA Y EL DERECHO APLICABLE.

E. ERRÓ MANIFIESTAMENTE EL TPI AL CONCEDER DEFERENCIA, SIN REALIZAR UNA EVALUACIÓN MINUCIOSA, A LA CONCLUSIÓN DEL ÁRBITRO QUE LA UPR NO PUEDE MODIFICAR SU REGLAMENTACIÓN PARA CUMPLIR CON LA LEY Y REGLAMENTACIÓN APLICABLE.

F. ERRÓ MANIFIESTAMENTE EL TPI AL CONCEDER DEFERENCIA, SIN REALIZAR UNA EVALUACIÓN MINUCIOSA, A LA DETERMINACIÓN DEL ÁRBITRO QUE LA UPR VIOLÓ LO QUE CATALOGÓ COMO UN "CONVENIO COLECTIVO". YA QUE DE SER ASÍ Y SER ADEMÁS EL SINDICATO UNA UNIÓN, COMO ERRÓNEAMENTE CONCLUYÓ EL ÁRBITRO, COMPETE ENTONCES A LA JUNTA DE RELACIONES DE TRABAJO DE PUERTO RICO, BAJO SU JURISDICCIÓN EXCLUSIVA DE REMEDIAR PRÁCTICAS ILÍCITAS EN CASOS DE VIOLACIÓN A UN CONVENIO COLECTIVO, REMEDIAR LA PRÁCTICA ILÍCITA.

El 12 de mayo de 2023, la parte recurrida compareció mediante *Oposición a que se expida el auto de certiorari*.

Con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica aplicable a la controversia ante nuestra consideración.

**II.**

**-A-**

El auto de *certiorari* constituye un vehículo procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior[10]. La determinación de expedir o denegar este tipo de recursos se encuentra enmarcada dentro de la discreción judicial[11]. De ordinario, la discreción consiste en "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera"[12]. Empero, el ejercicio de la discreción concedida "no implica la potestad de actuar arbitrariamente, en una u otra forma, haciendo abstracción del resto del derecho"[13].

Ahora bien, en los procesos civiles, la expedición de un auto de *certiorari* se encuentra delimitada a las instancias y excepciones contenidas en la Regla 52.1 de Procedimiento Civil[14]. La mencionada Regla dispone que solo se expedirá un recurso de *certiorari* cuando "se recurra de una resolución u orden bajo remedios provisionales de la Regla 56, *injunctions* de la Regla 57[15] o de la denegatoria de una moción de carácter dispositivo"[16].

Asimismo, y a manera de excepción, se podrá expedir este auto discrecional cuando:

    (1) se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales,

    (2) en asuntos relacionados a privilegios evidenciarios,

    (3) en casos de anotaciones de rebeldía,

    (4) en casos de relaciones de familia,

---

[10] Véase, *Torres González v Zaragoza Meléndez*, 2023 TSPR 46, 211 DPR ___ (2023), *800 Ponce de León Corp. V. American International Insurance*, 205 DPR 163 (2020), *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012); *García v. Padró*, 165 DPR 324, 334-335 (2005); *Negrón v. Srio. de Justicia*, 154 DPR 79, 90-92 (2001).

[11] *Íd.*

[12] *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2014); *Negrón v. Srio. De Justicia*, 154 DPR 79, 91 (2001).

[13] *Íd.*

[14] 32 LPRA Ap. V, R. 52.1. *Scotiabank v. ZAF Corp,* 202 DPR 478 (2019).

[15] 32 LPRA Ap. V, R. 56, R.57.

[16] *800 Ponce de León Corp. V. American International Insurance, supra.*

(5) en casos revestidos de interés público o

(6) en cualquier situación en la que esperar a una apelación constituiría un fracaso irremediable de la justicia"[17].

Para poder ejercer sabiamente nuestra facultad discrecional en la consideración de los asuntos planteados mediante dicho recurso, la Regla 40 del Reglamento del Tribunal de Apelaciones[18] dispone lo siguiente:

El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

El Tribunal de Apelaciones sólo intervendrá en el ejercicio de la discreción del Tribunal de Primera Instancia en aquellas situaciones en que se demuestre que este último: (1) actuó con perjuicio o parcialidad, (2) incurrió en un craso abuso de discreción o (3) se equivocó en interpretar o aplicar cualquier norma procesal o de derecho sustantivo[19]. Los criterios previamente transcritos pautan el ejercicio sabio y prudente de la facultad discrecional judicial[20]. La delimitación que imponen estas disposiciones reglamentarias tiene "como propósito evitar la dilación que causaría

---

[17] *Íd.*
[18] 4 LPRA Ap. XXII-B.
[19] *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).
[20] *Mun. Aut. De Caguas v. JRO Construction,* 201 DPR 703, 712 (2019).

la revisión judicial de controversias que pueden esperar a ser planteadas a través del recurso de apelación"[21].

**-B-**

En nuestro ordenamiento jurídico, los derechos de los trabajadores a organizarse, a negociar y a llevar a cabo otras actividades concertadas son de rango constitucional. La Sec. 17 de la Carta de Derechos de la Constitución de Puerto Rico[22], establece que los trabajadores de empresas, negocios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar. Además, con el propósito de asegurar estos derechos, la Sec. 18 de la Carta de Derechos[23], otorgó en sus relaciones directas con sus propios patronos el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.

Por otra parte, la Ley Núm. 1 de 20 de enero de 1966, según enmendada, conocida como *Ley de la Universidad de Puerto Rico Ley*[24] (Ley Núm. 1), persigue el propósito de "reorganizar la Universidad de Puerto Rico, reafirmar y robustecer su autonomía y facilitar su continuo crecimiento"[25]. Asimismo, dispone que "[l]a Universidad de Puerto Rico continuará siendo una corporación pública"[26].

En cuanto a las garantías que se le reconocen al personal universitario, el Artículo 15 de la Ley Núm. 1 dispone lo siguiente:

[...]

---

[21] *Scotiabank v. ZAF Corp., supra*, págs. 486-487; *Mun. Aut. De Caguas v. JRO Construction, supra.*

[22] Art. II, Sec. 17, Const. PR, LPRA, Tomo 1; *Universidad de Puerto Rico v. Unión Bonafide de Oficiales de Seguridad de la Universidad de Puerto Rico,* 206 DPR 140 (2021).

[23] Art. II, Sec. 18, Const. PR, LPRA, Tomo I.

[24] 18 LPRA sec. 601 nota, *et. seq.*

[25] 18 LPRA sec. 601 nota.

[26] *Íd.*

(2) Se garantiza la continuidad de todos los derechos adquiridos por todo el personal universitario en virtud de lo dispuesto en la legislación vigente a la fecha de aprobación de esta ley.

(3) Se garantiza la continuidad de las obligaciones contractuales incurridas por el Rector de la Universidad o la administración universitaria actual con los trabajadores y empleados de la planta física en convenios colectivos voluntarios con las organizaciones de dichos trabajadores o empleados[27].

Por su parte, la Ley Núm. 130 de 8 de mayo de 1945, según enmendada, conocida como Ley de Relaciones del Trabajo de Puerto Rico[28] (Ley Núm. 30-1945 o Ley de Relaciones del Trabajo), define organización obrera como sigue:

(10) Organización obrera. — Significa una organización de cualquier clase o cualquier agencia o comisión de representación de empleados o cualquier grupo de empleados actuando concertadamente o plan en el cual participen los empleados y que exista con el fin, en todo o en parte, de tratar con un patrono con respecto a quejas y agravios, disputas, salarios, tipos de paga, horas de trabajo y/o condiciones de empleo[29].

La Ley Núm. 168 de 29 de septiembre de 2014 enmendó la Ley Núm. 130-1945. Particularmente, dicha enmienda incluyó un cambio al inciso 11 del Art. 2 de la Ley Núm. 130-1945, el define instrumentalidad corporativa como sigue:

(11) Instrumentalidades corporativas.- Significa toda corporacion o instrumentalidad publica y sus subsidiarias, e incluirá también las empresas similares que se establezcan en el futuro y sus subsidiarias, y aquellas otras agencias del Gobierno que se dedican o pueden dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario[30].

Ante esta enmienda, la jurisprudencia más reciente ha establecido que la UPR es un "patrono" sujeta por ello a la jurisdicción de la Junta de Relaciones del Trabajo de Puerto Rico[31].

**-C-**

Los convenios colectivos representan un contrato que tiene fuerza de ley entre las partes que lo acuerdan y lo suscriben[32]. En

---

[27] 18 LPRA sec. 601, nota.
[28] 29 LPRA sec. 62, *et. seq.*
[29] 29 LPRA secc. 63.
[30] 29 LPRA sec. 64(11).
[31] *UPR v. Unión Oficiales UPR,* 206 DPR 140, 150 (2021).
[32] *J.R.T. v. Junta Am. Muelle Mun. de Ponce,* 122 DPR 318 (1988).

éstos se recogen las normas que habrán de marcar las relaciones entre patronos y empleados, por ello, sus términos y condiciones obligan tanto al patrono como a la unión y a sus miembros[33].

Ahora bien, en cuanto a la interpretación de los convenios colectivos **nuestro ordenamiento jurídico ha reconocido la doctrina de las prácticas pasadas**. El Prof. Demetrio Fernández define el término de prácticas pasadas como "un patrón de conducta consistentemente observado en situaciones recurrentes que crea en las partes el entendimiento de que esa es la conducta adecuada"[34]. Más aun, reconoce que dicha práctica puede crear una condición de empleo vinculante a pesar de no estar sostenida en el convenio colectivo.

De otra parte, para calificar una conducta como práctica pasada se deben evaluar los siguientes factores: la claridad y consistencia en el patrón de conducta, la repetición de la actividad, la aceptabilidad de la conducta y el mutuo reconocimiento por las partes[35]. En cuanto al modo de modificar tal práctica, el tratadista Fernández nos indica que:

> La práctica establecida que resulta en una condición de empleo exigible, sin tener base en el convenio, no puede ser modificada o terminada unilateralmente durante la vigencia del contrato. Cualesquiera parte puede reproducir la práctica pasada, pero ello tiene que acontecer en el momento en que se negocia un nuevo convenio porque su existencia continua depende de la intención que se infiere de que permanezca vigente la condición existente ante la ausencia de objeción o reparo alguno[36].

**-D-**

Las relaciones obrero-patronales, la negociación colectiva y los procedimientos de arbitraje están vinculadas al desarrollo económico, a la paz industrial y, por ende, a la consecución de los

---

[33] *J.R.T. v. Corp. de Crédito Agrícola,* 124 DPR 846, 849 (1989); *Rivera Adorno v. Autoridad de Tierras,* 83 DPR 258 (1961).
[34] D. Fernández Quiñones, *El Arbitraje Obrero-Patronal,* 1ra ed., Legis Editores, S.A., 2000, pág. 242.
[35] Fernández Quiñones, *Op cit,* pág. 242.
[36] *Íd.*

interes públicos[37]. El arbitraje está considerado como un método alterno a la intervención judicial para la solución de conflictos[38]. En Puerto Rico existe una vigorosa política pública a favor del arbitraje obrero-patronal. Se entiende que el arbitraje es el medio menos técnico, más flexible, menos oneroso y, por tanto, más apropiado para la resolución de las controversias que emanan de la relación laboral[39]. El arbitraje es un procedimiento de poderes delegados y mediante el convenio colectivo se le confiere la autoridad al árbitro para que evalúe y resuelva las controversias que allí se especifican[40].

Concerniente al proceso de arbitraje, el laudo representa la determinación que toma el árbitro respecto a la controversia laboral[41]. Se ha establecido que el laudo de arbitraje no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos[42]. El contenido del laudo de arbitraje incluye dos elementos principales: 1) la parte sustantiva de derecho en la que se expone la razón de la decisión y, 2) la parte dispositiva en la que se establece el remedio a la disputa. La emisión del laudo termina la función adjudicativa del árbitro[43].

Referente a la revisión judicial de los procesos de arbitraje, nuestro más alto foro ha expresado que, aunque la intervención no esté vedada, ante un convenio de arbitraje lo más prudente es la abstención judicial[44]. Por ello, cuando se acuerda el uso del arbitraje como mecanismo para ajustar las controversias, se crea un foro sustituto a los tribunales de justicia, cuya interpretación merece gran deferencia[45].

---

[37] *COPR v. SPU*, 181 DPR 281, 319 (2011).
[38] *Íd.*, pág. 362.
[39] *Martínez Rodríguez v. AE.*, 133 DPR 986 (1993).
[40] A. Acevedo Colom, *Legislación protectora del trabajo comentada*, 8va ed. Rev., Puerto Rico, Ed. Ramallo Printing Bros., 2005, pág. 393.
[41] *COPR v. SPU, supra*, pág. 368.
[42] *Íd.*, pág. 328.
[43] *Íd.*, en las págs. 368-369.
[44] *UCPR v. Triangle Engineering Corp.*, 136 DPR 133 (1994).
[45] *López v. Destilería Serrallés*, 90 DPR 245 (1964); *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 DPR 318 (1988).

Es por esto, que la revisión de los laudos de arbitraje se circunscribe a la determinación de: (1) la existencia de fraude, (2) conducta impropia, (3) falta del debido proceso de ley, (4) violación a la política pública, (5) falta de jurisdicción o, (6) que el laudo no resuelve todos los asuntos en controversia. Las decisiones de los tribunales de primera instancia, de las agencias administrativas y los laudos arbitrales se reputarán persuasivas[46]. En tal supuesto, la revisión judicial de los laudos de arbitraje es análoga a la revisión judicial de las decisiones administrativas[47]. No obstante, el Tribunal Supremo ha aclarado que la intervención judicial no se justifica por una mera discrepancia de criterio con el árbitro ya que se destruiría la esencia de los procesos de arbitraje[48]. Por lo tanto, es la norma que los foros judiciales apelativos tendrán la autoridad para revisar todas las cuestiones de derecho sustantivo resueltas por el árbitro para poder determinar si son correctas[49]. Es decir, procede la anulación solo si no se ha resuelto la controversia conforme a derecho[50].

## III.

En su recurso, la parte peticionaria nos solicita la revisión de la *Sentencia*[51] emitida el 20 de marzo de 2023, notificada el 27 de marzo de 2023, por el TPI mediante la cual confirmó el Laudo emitido el 22 de enero de 2022 por el Árbitro designado por el Negociado del DTRH y, en consecuencia, declaró No Ha Lugar la *Solicitud de Revisión de Laudo de Arbitraje* presentada por la parte peticionaria.

---

[46] *Íd.*

[47] *Rivera v. Dir. Adm. Trib.,* 144 DPR 808 (1998); *Condado Plaza v. Asoc. Emp. Casinos PR,* 149 DPR 347 (1999); *UCPR v. Triangle Engineering Corp.,* 136 DPR 133 (1994).

[48] *UGT v. Centro Médico del Turabo, supra*, pág. 929.

[49] *COPR v. SPU, supra*, pág. 370.

[50] *Íd.*

[51] Véase apéndice del recurso de *Certiorari, Sentencia* a la págs. 788-790.

Tras examinar detenidamente la totalidad del expediente ante nuestra consideración y haber analizado los argumentos de la parte peticionaria, concluimos que procede confirmar la *Sentencia* impugnada. Somos del criterio que ni el Árbitro ni el foro primario abusaron de su discreción. Veamos.

Por estar estrechamente relacionados entre sí, discutiremos de forma conjunta los señalamientos de error presentados por la parte peticionaria. En el caso de autos, el 20 de enero de 2015, las partes suscribieron unas *Reglas y Condiciones de Trabajo Suplementarias a la Reglamentación Vigente para el Personal de Mantenimiento, Construcción y Servicio Agrícola de la Universidad de Puerto Rico*[52] (Reglas y Condiciones de Trabajo Suplementarias). En lo pertinente, el Artículo 77 de las referidas reglas disponía lo siguiente:

ARTÍCULO 77 SERVICIOS MÉDICOS

A. La Universidad contribuirá con una aportación mensual hasta la cantidad de seiscientos cuarenta dólares con cuarenta y tres centavos ($640.43) por unidad familiar a los empleados regulares cubiertos por estas Reglas hacia el costo de una cubierta de servicios médicos a estos y a sus dependientes directos. El proveedor actual de estos servicios es MAPFRE. A partir del mes de mayo del segundo y tercer año de vigencia de estas Reglas, la Universidad contribuirá con una aportación igual a la que esta provea a los demás empleados de la institución.

[…]

G. La Universidad autorizará a no más de dos (2) delegados o representantes del Sindicato por unidad institucional, por el periodo determinado por la Administración, para proveer orientación anual sobre el Plan Médico Auspiciado por el Sindicato al personal universitario en igualdad de condiciones con otros planes autorizados. El tiempo utilizado para este propósito será sin cargo a licencia alguna[53].

El 9 de marzo de 2021, surgieron comunicaciones con el propósito de iniciar el proceso de diálogo de unas nuevas Reglas y Condiciones de Trabajo Suplementarias[54]. En consecuencia, el 28

---

[52] Véase apéndice del recurso de *Certiorari,* págs. 16-48.
[53] Véase apéndice del recurso de *Certiorari,* pág. 46.
[54] Véase apéndice del recurso de *Certiorari*, pág. 265.

de junio de 2021, la Junta de Gobierno de la UPR aprobó la Certificación No. 129 2020-2021 mediante la cual dejó sin efecto los incisos A y G de la Reglas y Condiciones de Trabajo Suplementarias.

Según surge del Laudo emitido por el árbitro designado por el Negociado del DTRH:

> [...]
>
> A tenor con esto, debemos concluir que **al menos por los últimos 15 años la práctica entre las partes era que se acordaba una aportación máxima y la Unión es que negocia directamente con los proveedores médicos del plan de la cobertura.** Que una vez, establecido quien proveería dicha cobertura la Universidad emitía los pagos correspondientes.
> Aunque dicho procedimiento no se encuentra establecido claramente en el lenguaje del Artículo 77; **lo cierto es que el uso y costumbre entre las partes es el Sindicato es quien negocia con los proveedores de planes Médicos e informa a la Universidad cual es el proveedor escogido para que remita el pago**.
>
> [...]
>
> Aun cuando el argumento que levanta la Universidad en cuanto a que el lenguaje del Artículo 77 no establece claramente que el Sindicato negocia directamente el plan médico de sus miembros, es cierto. **El hecho, es que por los últimos tres convenios la práctica y costumbre ha sido que la Unión es quien ha negociado directamente con el proveedor del plan y luego informa a la Universidad quien va a ser el proveedor para que se remita los pagos**.
>
> [...][55]. (Énfasis nuestro).

Apuntalamos que la UPR siguió una práctica distinta a la estipulada en las Reglas y Condiciones de Trabajo Suplementarias respecto a la negociación del proveedor del seguro médico. Según la evidencia admitida ante el Árbitro, el uso y costumbre entre las partes era que la parte peticionaria aceptaba la negociación de la parte recurrida.

En virtud de ello, no actuó contrario a derecho el TPI al confirmar el Laudo de Arbitraje impugnado a base de la doctrina de prácticas pasadas, ya que se configuraron los requisitos de dicha doctrina. La UPR, al aceptar dicha práctica por un período prolongado de tiempo, la adoptó tácitamente como parte de los

---

[55] Véase apéndice del recurso de *Certiorari*, págs. 11-12.

acuerdos entre estos. De esta forma, la aludida práctica se convirtió en ley entre las partes. A tales efectos, advertimos que entre la UPR y el Sindicato hubo una práctica consistente y repetitiva por aproximadamente quince años y que ésta fue aceptada y reconocida mutuamente por las partes. De tal manera, la UPR estaba impedida de modificar unilateralmente la práctica aceptada entre las partes, la cual se convirtió en el uso y costumbre por varios años.

Es decir, la decisión tomada tanto por el Árbitro como por el TPI no fue contraria a derecho ni fue tomada mediando prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba. Tampoco la parte peticionaria constató que, el abstenernos de interferir con el dictamen del TPI, constituiría un fracaso irremediable de la justicia, de manera que estemos llamados a ejercer nuestra función revisora. Por consiguiente, expedimos el auto de *certiorari* y confirmamos la *Sentencia* apelada.

**IV.**

Por los fundamentos antes expuestos, **expedimos** el auto de *certiorari* y **confirmamos** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. La Jueza Álvarez Esnard concurre sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones